UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

CK, by his Next Friend
Marisa Springstead,

    Plaintiffs,

v.

OAKLAND COMMUNITY HEALTH
NETWORK; DANA LASENBY, Director of
Oakland Community Health Network,
in her official capacity; MICHIGAN
DEPARTMENT OF HEALTH AND HUMAN
SERVICES; ROBERT GORDON, Director of
Michigan Department of Health and
Human Services in his official capacity;
and GRETCHEN WHITMER, Governor of Michigan,
in her official capacity;

    Defendants.

Honorable

Case No:

**COMPLAINT TO ENFORCE SETTLEMENT AGREEMENT FROM CASE 2:17-CV-11988**

_____/

Disability Rights Michigan
Simon Zagata (P83162)
Chris Davis (P52159)
Mark Cody (P42695)
Attorneys for Plaintiff
4095 Legacy Parkway
Lansing, MI 48911
(517) 487-1755
szagata@drmich.org
cdavis@drmich.org
mcody@drmich.org
_____/

## **COMPLAINT TO ENFORCE SETTLEMENT AGREEMENT**

## **FROM CASE 2:17-CV-11988**

### I. INTRODUCTION

1. In June 2017 Plaintiff C.K., through his Next Friend Marisa Springstead, brought suit against Oakland Community Health Network (OCHN), OCHN's Executive Director Willie Brooks, Michigan Department of Health and Human Services (MDHHS), MDHHS Director Nick Lyon, and Governor Rick Snyder.

2. That suit alleged that Defendants authorized CK for home and community-based services, in particular Applied Behavior Analysis (ABA), Community Living Supports (CLS), and Respite, but failed to provide those services.

3. CK alleged that Defendants failure to provide those services put him at serious risk of isolation, segregation and institutionalization in violation of Section 504 of the Rehabilitation Act of 1973 and Title II of the Americans with Disabilities Act of 1990 as interpreted by *Olmstead v. LC ex rel Zimring*, 527 U.S. 581, 597-600 (1999).

4. In April of 2018, the parties reached a settlement agreement resolving all claims, attached as Exhibit 1.

5. On April 24, 2018, the Honorable David M. Lawson entered an Order approving the settlement, dismissing the case, and retaining jurisdiction to enforce the terms of the settlement. Exhibit 2.

6. Now, Plaintiff brings this suit alleging that Defendants have breached the settlement agreement and asking the Court to enforce the terms of the settlement agreement.

## II. JURISDICTION AND VENUE

7. Jurisdiction in the original case was conferred by 28 U.S.C. §§ 1331, 1343.

8. Jurisdiction is proper in this case as the Order dismissing the previous case retained jurisdiction to enforce the terms of the settlement and incorporated those terms. Exhibit 2; *Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375, 380-81 (1994).

9. Declaratory and injunctive relief are authorized pursuant to 28 U.S.C. §§ 2201, 2202; 29 U.S.C. 794a; 42 U.S.C. § 1983; and 42 U.S.C. § 12133.

10. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), as all of the acts and omissions giving rise to the claims occurred in Oakland County.

## III. PARTIES

### A. The Plaintiff

11. Plaintiff is a 15-year-old Medicaid beneficiary. He is diagnosed with Autism Spectrum Disorder, Disruptive Mood Dysregulation Disorder, ADD, Moderate Intellectual Disability, and Obsessive-Compulsive Disorder.

12. CK currently lives at home with his mother and next friend in Oakland County.

13. To live in his home, CK requires supports and services, which are outlined in his Individual Plan of Service (IPOS).

14. Defendants and Plaintiffs develop CK's IPOS through an interactive planning process. The services authorized are based on the recipient's goals, the activities needed to help the recipient reach those goals and medical necessity.

15. The services in CK's IPOS are medically necessary early and periodic screening, diagnostic, and treatment (EPSDT) services under 42 U.S.C. § 1396d(r).

16. CK's rights to EPSDT services are enforceable under 42 U.S.C. §§ 1396a(10)(A), 1396d(a)(4)(B).

**B.     The Defendants**

17. Defendant, Gretchen Whitmer, is the Governor of the State of Michigan. Under Article V, Section 8, of the Michigan Constitution, she is charged with seeing that the laws of the State of Michigan are faithfully executed. She is also in charge of all departments of the Michigan government, including Michigan Department of Health and Human Services. *Id.*

18. Defendant, Gretchen Whitmer, is being sued in her official capacity.

19. Defendant, MDHHS, is the agency designated as the single state agency responsible for administering and implementing Michigan's Medicaid program under 42 U.S.C. § 1396a(a)(5).

20. Defendant Robert Gordon is the Director of MDHHS.

21. MDHHS' offices are located in Ingham County, Michigan.

22. As Director, Robert Gordon is responsible for ensuring Michigan's Medicaid program is administered and implemented consistent with the requirements of federal law.

23. Defendant Robert Gordon is also responsible for administering and overseeing Michigan's entire Mental Health system pursuant to M.C.L. § 330.1104, given MDHHS' establishment, authority, and powers stem from Michigan's Constitution, which states "the health of

5

the people of the state is a matter of primary public concern, and as required by section 8 of article VIII of the state constitution of 1963, which declares that services for the care, treatment, education, or rehabilitation of those who are seriously mentally disabled shall always be fostered and supported, the department shall continually and diligently endeavor to ensure that adequate and appropriate mental health services are available to all citizens throughout the state." M.C.L. § 330.1116.

24. Defendant Robert Gordon is being sued in his official capacity.

25. Defendant, Oakland Community Health Network (OCHN), is a community mental health service program (CMHSP) established by the Michigan Mental Health Code where it states the "purpose of a community mental health services program shall be to provide a comprehensive array of mental health services appropriate to conditions of individuals who are located within its geographic service area, regardless of an individual's ability to pay." M.C.L. § 330.1206.

26. OCHN is located and operates in Oakland County, Michigan. OCHN is required to provide mental health services to children with developmental disabilities living in Oakland County. M.C.L. § 330.1208.

27. OCHN is not only the community mental health service program for Oakland County operating under state law, but also a specialty prepaid health plan (PIHP) considered a Medicaid managed care organization under M.C.L. § 400.109f. Under federal law, a Medicaid managed care organization provides or arranges for services under 42 U.S.C. § 1396u-2(a)(1)(B).

28. Defendant, Dana Lasenby, is the Director of OCHN. She has the ultimate responsibility, authority, oversight, and control over all of OCHN's services, programs, and operations.

29. Defendant Dana Lasenby is being sued in her official capacity.

30. Defendants OCHN and MDHHS were Defendants in the prior suit.

31. Defendants Robert Gordon, Gretchen Whitmer and Dana Laserby hold the positions held by the individually named Defendants in 2:17-cv-11988, Nick Lyon, Rick Snyder and Willie Brooks, and are their successors in interest.

### C. Previous Settlement

32. Plaintiff and Defendants reached a settlement agreement in case 2:17-cv-11988 on April 24, 2018. Exhibit 1.

7

33. In the agreement, in exchange for dismissal of all claims, Defendants agreed to pay Plaintiff $32,500 and take action related to the services in Plaintiff's IPOS. Exhibit 1.

34. Defendants agreed to add Intensive Crisis Stabilization Services (ICSS) to Plaintiff's IPOS. Response time to a request for ICSS was to be within one hour, or a maximum of two hours if unforeseen circumstances arose. Exhibit 1.

35. Defendants agreed to provide CK with the CLS and Respite in the IPOS. Exhibit 1.

36. CLS services are designed to promote community inclusion and increase the recipient's ability to function independently and be productive in the least restrictive setting appropriate.

37. To ensure this, Defendant OCHN agreed to "require that the contract with any CLS and/or In-Home Respite provider has stipulations preventing the provider from discontinuing services without notice and/or prior to another provider or staffing option being identified." Exhibit 1.

38. If subcontracted providers could not staff CK's CLS and/or In-Home Respite services, Defendant OCHN committed to "enforce contract provisions with MORC to supply its own staff on those occasions

8

where a sub-contracted provider cannot staff CLS and/or In-Home Respite Services…." Exhibit 1.

39. The parties agreed to the terms of the settlement in the Honorable David M. Lawson's chambers and put the terms of the agreement on the record before submitting the written agreement to this Court.

40. On April 24, 2018, the Honorable David M. Lawson entered an Order dismissing the case and approving the terms of the settlement. 2:17-cv-11988, ECF No. 41, Page.ID255.

41. In that Order, this Court retained jurisdiction to enforce the terms of the settlement. 2:17-cv-11988, ECF No. 41, Page.ID255.

**D.   Defendants' Breach of Settlement Agreement**

42. In August of 2020, Plaintiff's mother and next friend contacted Disability Rights Michigan (DRM) to report that Plaintiff did not have staff to provide the CLS and Respite hours in CK's IPOS.

43. Prior to a rebranding in August 2020, DRM was called Michigan Protection and Advocacy Service, Inc. (MPAS). MPAS represented CK in the previous suit.

44. Plaintiff's mother reported that out of the 30 CLS hours per week authorized in the IPOS, Plaintiff only had staff for 6 of those hours.

45. For In-home respite, Plaintiff was in a worse situation. CK had no staff for In-home respite, out of the 12 hours per week MORC authorized.

46. Adding to the problem, some of Plaintiff's CLS providers quit without giving notice that they would no longer provide CLS hours. Under the settlement, Defendant OCHN is obligated to enforce contract provisions preventing this practice.

47. CK's authorization of 30 CLS hours and 12 in-home respite hours a week was supposed to reduce in September, when CK went to school.

48. When CK is in school, he is authorized for 20 hours of CLS and 12 hours of in-home respite a week.

49. CK did not return to school in September due to the ongoing pandemic.

50. CK's IPOS authorizes 24 days per authorization period of out-of-home respite at Judson Center. As an authorization period is 6 months long, this equates to 4 days per month.

51. CK only receives 2 days per month of out-of-home respite, instead of the 4 he is authorized for.

52. Marisa reported that CK lost CLS and Respite service staffing in early March 2020.

53. From March 2020 until August 10, 2020, CK had no staff for his CLS or respite hours.

54. CK had staffing for at least some of his CLS and respite hours for a little over a month, until October 23, 2020.

55. After October 23, 2020, CK had no staff for CLS or in-home respite. In August, September and October, staff could not fill all of the service hours in CK's IPOS.

56. Attempting to get CK some services, Marisa sent CK back to school in October, despite the risks during the pandemic.

57. After Marisa contacted DRM, DRM staff reached out to MORC and OCHN to remind them of their obligations under the settlement agreement.

58. MORC staff stated that they did not have, and never did have, a contract with OCHN on file for CK's case that required advance notice before CLS and/or in-home respite providers stopped services.

59. MORC staff also stated that they were not aware of any contract between MORC and OCHN in CK's case that required MORC to

supply its own staff if subcontracted providers could not provide the services in CK's IPOS.

60. OCHN failed to comply with the settlement because it neither had nor enforced the contract provisions described in the settlement.

61. On October 8, 2020, DRM staff emailed OCHN, describing the alleged breaches of the settlement agreement.

62. OCHN responded that it was not obligated to comply with the settlement agreement for two reasons.

63. First, OCHN argued that because OCHN "resumed responsibility for maintaining provider network contracts" in October 2019, "a settlement agreement obligating MORC to provide staffing is no longer applicable."

64. The settlement agreement obligates OCHN's contract with MORC to require MORC to provide staffing for CK's case if sub-contracted providers cannot. OCHN still contracts with MORC. By OCHN's own statement, it is responsible for maintaining provider network contracts. Therefore, the settlement is still applicable.

65. Second, OCHN claimed that the "global pandemic, the State of Emergency, and multiple related Executive Orders, collectively,

12

constitute force majeure impacting the ability to provide in-home supports and associated contractual obligations."

66. MDHHS policy during the pandemic does not stop OCHN from providing CK's services or meeting its settlement obligations. On the contrary, MDHHS policy defines behavioral intervention services as essential and mandates that they should continue in person. Exhibit 3, MDDHS Communication #20-01.

67. The settlement does not contain any *force majeure* clause and Defendants have not shown that it is impossible to meet the terms of the settlement.

68. Even if the pandemic made it impossible to staff CK's CLS and/or respite hours, it does not excuse Defendants' failure to enter into the contracts described in the settlement or provide ICSS.

69. CK and his family need CLS services to support the family in maintaining CK's health and reinforcing good behaviors.

70. At no point has Defendant OCHN enforced contract provisions with MORC requiring MORC to staff the hours CK is missing.

71. Defendant MDHHS, as the single state agency responsible for administering the Medicaid program, has not required OCHN to comply with the terms of the settlement.

13

72. Defendants' breach of the Settlement is deleterious to CK's health, his mother's health, and their living situation.

73. CK's CLS services are essential. CK needs assistance with mood regulation, coping skills, and displaying appropriate behavior in public.

74. CK's CLS staff, when available, help him develop the above skills by redirecting his inappropriate behavior, giving verbal prompts, modeling, and providing sensory activities.

75. When CK has CLS staff, he participates in community activities like playing basketball, going to the park, and going to stores. These activities give CK an opportunity to practice appropriate behavior, communication skills and life skills.

76. CK's CLS hours help him cope with emotions without aggression and redirect him when he fixates on something.

77. Without those services, CK's aggressive behaviors increase.

78. Since CLS hours ended in October, CK has had about one meltdown a day. A "meltdown" is an instance when CK's behavior gets to the point of risking physical harm to either himself or others.

79. CK's meltdowns often occur when he fixates on something he wants to do or have but cannot. When this occurs, his demand for the thing

      escalates, leading to screaming in someone's face, grabbing their forearms and squeezing, and hitting himself, the wall, or others.

80. CK has fewer meltdowns with appropriate staffing. Staff are able to redirect CK's attention and calm him down with games, activities, and techniques to work through his emotions.

81. CK's meltdowns are no laughing matter. At five foot seven and 195 pounds, he is growing into a man. Proper CLS staffing helps CK regulate his emotions without a meltdown and teaches him techniques to express himself appropriately.

82. CK has injured his mother and grandmother several times since October. When staff are present, they can help CK's family redirect his behaviors and act as an intermediary between CK and his mother, before CK gets violent.

83. Marisa and CK live with Marisa's mother. Marisa fears they will lose their housing due to CK's increase in aggressive behaviors towards herself and her mother since October.

84. In addition, Marisa is exhausted and scared. She gets one break a month from caring for CK, when he goes to out-of-home respite for 16 hours. She gets no in-home respite.

85. The lack of respite care exhausts Marisa, reduces her capacity to handle CK's outbursts, and increases the chances that CK will end up needing treatment in a more restrictive setting.

86. To top it all off, the settlement agreement mandates ICSS, with a required response time of one hour or less, or two hours if mitigating circumstances exist. Exhibit 1.

87. Defendants added ICSS to CK's IPOS, but when Marisa tries to use it, it does not conform with the settlement agreement. Most times, no one shows up to the house at all, or the response time is well beyond two hours.

88. On October 3, 2020, Marisa called the ICSS provider when CK was being physically violent. The ICSS provider, allegedly designed to respond to mental health crises, told Marisa to call the police on her 15-year-old son having a mental health crisis.

89. CK and Marisa live with Marisa's mother. Due to CK's increased aggression since October, both Marisa and her mother fear for their health. If CK's aggression does not decrease, Marisa's mother cannot have him in the home.

90. Every day that CK goes without services, his behavior worsens. CK loses time to make progress towards independence and community

inclusion. Every day without the services in his IPOS, CK suffers harm.

91. Defendants' failure to comply with the settlement puts CK at risk of homelessness.

92. Prior to the suit in 2017, CK had to be hospitalized several times due to the lack of services in his home. Defendants' failure to comply with the settlement increases CK's chances of returning to this cycle of hospitalizations.

93. Due to the family's exhaustion and safety concerns in the home, CK's risk of ending up in the foster care system is greatly increased.

94. CK has the right to live as independently as possible and remain at home with the community-based services he requires, but Defendants' failure to provide these necessary services has placed him at serious risk of further institutionalization.

## REQUESTED RELIEF

Wherefore, Plaintiff respectfully requests this Court to:

A. Declare Defendants violated the terms of the Settlement Agreement attached as Exhibit 1.

B. Enter an Order requiring Defendants' specific performance of the terms of the Settlement Agreement, including enforcing the contract provisions to provide CK's CLS and respite services.

C. Impose a monetary penalty for each day Defendants fail to comply with the Order in B above.

D. Appoint an independent monitor to ensure Defendants' compliance with the Settlement Agreement.

E. Retain jurisdiction over this action to enforce the settlement agreement.

F. Award Plaintiff attorney's fees and costs associated with enforcing the settlement agreement.

G. Grant such other relief as it may appear Plaintiff is entitled to or this court deems necessary.

Respectfully submitted,

Dated: December 15, 2020
s/*Simon F. Zagata*
Simon F. Zagata (P83162)
Chris Davis (P52159)
Mark Cody (P42695)
Attorneys for Plaintiff
Disability Rights Michigan
4095 Legacy Parkway
Lansing, MI 48911
(517) 487-1755