UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

C.K. by his Next Friend,
MARISSA SPRINGSTEAD,

                         Plaintiff,                        Case Number 20-13301

v.                                               Honorable David M. Lawson

OAKLAND COMMUNITY HEALTH
NETWORK, DANA LASENBY,
MICHIGAN DEPARTMENT OF HEALTH
AND HUMAN SERVICES, ROBERT
GORDON, and GOVERNOR GRETCHEN
WHITMER, in her official capacity,

                         Defendants.

_____/

## OPINION AND ORDER GRANTING IN PART MOTION FOR PRELIMINARY INJUNCTION AND GRANTING STATE DEFENDANTS' MOTION TO DISMISS

Plaintiff C.K. is a developmentally disabled adolescent who is eligible to receive mental health and community living support services through Medicaid. In 2017, he filed a lawsuit through Marissa Springstead, his mother and Next Friend, against the Oakland Community Health Network (OCHN) and its director, the Michigan Department of Health and Human Services (MDHHS) and its director, and the then-Governor of Michigan (in his official capacity) to compel them to furnish certain support services for his behavioral needs and to which he believed he was entitled under Medicaid. The parties entered into a written settlement agreement, which the Court approved and retained jurisdiction to enforce. In the present case, C.K. has sued the original defendants and the current Michigan governor in her official capacity alleging that the defendants have not lived up to their obligations under that agreement, and he now asks for declaratory and injunctive relief that will ensure that he receives the promised benefits.

The plaintiff also filed a motion for a preliminary injunction to compel the defendants to furnish certain community living and respite services while this case is pending.  The Court held an evidentiary hearing conducted via video teleconference facilities on May 12, 2021, and heard the testimony of three witnesses, including C.K.'s mother.  Defendant OCHN furnished two affidavits by its executive director.  The Court took the motion under advisement, and the parties filed supplemental briefs.  The state defendants (MDHHS, its director, and Governor Whitmer) have filed a motion to dismiss alleging that the complaint in this case fails to state a claim against them.  The Court recently heard oral argument on that motion, again by teleconference facility.  The parties, unfortunately, could not tell the Court that the poor staffing circumstances described at the May 12 hearing since have improved.

The plaintiff has shown that he would suffer irreparable injury absent an injunction mandating the furnishing of community living support, respite, and intensive crisis stabilization services as promised by the OCHN defendants in the settlement agreement.  However, he has not made the required showing against the state defendants.  The motion for a preliminary injunction, therefore, will be granted in part.  The plaintiff has not alleged facts that show that the state defendants breached the settlement agreement or otherwise failed to comply with its terms.  Their motion to dismiss will be granted.

I.

A.

According to the complaint, plaintiff C.K. is a 15-year-old Medicaid beneficiary diagnosed with autism spectrum disorder, learning disabilities, and obsessive-compulsive and mood-regulation disorders.  He has a history of severe outbursts, uncontrolled behavior, and physical aggression, which has resulted in him being hospitalized at least five times for psychiatric

treatment.  He lives with his mother in his grandmother's house in Oakland County and receives community living support services through the OCHN and the Macomb Oakland Regional Network (MORC).  According to his mother, Marissa Springstead, C.K. is capable of living in the community with appropriate services.  Springstead says that without appropriate services, C.K. is at high risk of institutionalization.

The OCHN is a specialty prepaid health plan, which is a Medicaid-managed care organization responsible for "providing defined inpatient services, outpatient hospital services, physician services, other specific Medicaid state plan services, and additional services approved by the Centers for Medicare and Medicaid Services under section 1915(b)(3) of Title XIX" of the Social Security Act, 42 U.S.C. § 1396n.  Mich. Comp. Laws § 400.109f.  Michigan law requires that the OCHN provide mental health services to people with developmental disabilities or serious mental illness living in Oakland County, Michigan. *See* Mich. Comp. Laws § 330.1208; Mot. PI, ECF No. 13, PageID.81. The OCHN meets its obligations under those statutes by subcontracting with other organizations to provide patient services.  Usually, it subcontracts with the MORC to arrange and pay for C.K.'s services.  Generally, the MORC would then contract with service providers to furnish the services in C.K.'s individual plan of service.

C.K.'s mother swore in an affidavit that these services "are essential" for C.K.'s health. She explained that C.K. "struggles to communicate, regulate his emotions and express himself appropriately."  Springstead Aff. ¶ 37, ECF No. 13-2, PageID.93. He "often fixates on things and people," and if he does not get what he wants, he often exhibits aggressive or violent behavior. *Id.* at ¶ 39.  The community living support services "are designed to help him cope with his emotions, teach him how to communicate appropriately, and express himself without aggression." *Id.*, ¶ 38 at PageID.94.  The service providers "use techniques to redirect him from what he is fixating on

. . . with small games or sensory activities. *Id.* at ¶ 40. And when C.K. fixates on this mother, his service providers "act as an intermediary, redirecting the fixation before CK" acts aggressively. *Id.* at ¶ 42.

B.

In June 2017, C.K. sued the present defendants and then-Michigan Governor Rick Snyder for declaratory and injunctive relief requiring that the defendants provide certain support services for his behavioral needs. *C.K. v. Michigan Dep't of Heath of Human Servs.*, No. 17-11988. He demanded that he be provided adequate intensive crisis stabilization, applied behavior analysis, community living support services, and respite services under Michigan's Medicaid program. Community living support services are supposed to give C.K. the tools to avoid his potentially dangerous behavior. Intensive crisis stabilization services are meant to intervene when those tools fail. He alleged that discharging him from a hospital without those support services violated his rights under the Americans with Disabilities Act, 42 U.S.C. § 12132 *et seq.*, the Rehabilitation Act of 1973, 29 U.S.C. § 794, and the Social Security Act, 42 U.S.C. §1396a(a)(10), including the "reasonable promptness" provision of section 1396a(a)(8).

The parties settled that case, with the defendants agreeing to pay C.K. $32,500 (split between the OCHN and MDHHS defendants equally) in exchange for a full release of all claims against them. Additionally, the agreement called for the provision of additional services, and provisions were made for staffing guarantees. The key language of the agreement reads as follows:

> 3. Intensive Crisis Stabilization Services (ICSS) has been added to CK's Individual Plan of Service as medically necessary. These services will be provided as long as they are determined to be medically necessary through New Oakland or another appropriate ICSS provider. These services will be provided in accordance with the Michigan Medicaid Provider Manual. Response time within Oakland County will be within one hour with the exception of unforeseen circumstances (which will be no more than two hours).

- 4 -

    4.   Community Living Support (CLS) Services and In-Home Respite will be provided to CK as indicated in the IPOS and scheduled in compliance with the Medicaid Provider Manual.  Ms. Springstead will no longer be the Employer of Record (EOR) for CLS or In-Home Respite Services.  OCHN will require that the contract with any CLS and/or In-Home Respite provider has stipulations preventing the provider from discontinuing service without notice and/or prior to another provider or staffing option being identified.  OCHN will enforce contract provisions with MORC to supply its own staff on those occasions where a sub-contracted provider cannot staff CLS and/or In-Home Respite Services.  MORC will ensure coordination of care between CLS and ABA by facilitating informal training (shadowing) education, and ongoing communication.  At no time will OCHN condone or fund duplicative services.

Compl., Ex. A, Settlement Agreement, ECF No. 1-2, PageID.23.  C.K. is entitled to about three hours of in-home services per day.

The Court approved the settlement and dismissed the case on April 24, 2018.

C.

The plaintiff lived at home with proper services from June 2018 until March 2020, when the coronavirus pandemic began to upset most aspects of daily living.  The parties' differing accounts of what happened during and after March 2020 reflect the plaintiff's unfulfilled needs against the backdrop of the defendants' struggles to address them.

According to the plaintiff, the MORC informed C.K.'s mother that it would no longer have staff to provide his community living supports or respite services.  C.K.'s mother states in an affidavit that C.K. did not resume receiving those services until August 10, 2020.  She says that from August 10 to October 23, 2020, C.K. had "at least some staff for his" services, but that they "did not fill all of [his]" service hours.  C.K.'s services completely stopped from October 23, 2020 through January 3, 2021.  On January 4, New Horizons furnished 19 community living support hours split between two staff until January 15, 2021.

The defendants, on the other hand, assert that rather than cutting C.K. off from services, C.K.'s mother advised the MORC that she was very concerned about having staff in her house due

- 5 -

to the pandemic and the risk of exposure to her elderly parents, which, in combination with pandemic-related staffing shortages, caused a temporary halt in at-home services until August 2020.  They maintain that C.K.'s mother then changed her position and requested resumption of in-home services and supports at that point.

The OCHN defendants contend that C.K.'s mother elected to forego services for the week of March 13 due to COVID-19 concerns and that the MORC encountered staffing shortages from March 19 through March 30, 2020.  The OCHN maintains that it provided services remotely via "Telehealth conferences" throughout the pandemic.  On April 13, 2020, the OCHN received an administrative order from the Michigan Department of Licensing and Regulatory Affairs (LARA) holding that C.K. no longer had a medical need for applied behavior analysis services.  Around this time until early May 2020, the OCHN contacted about 15 different support providers to secure community supports services for C.K., to no avail.  The defendants made little progress securing in-person services for C.K. but maintained Telehealth services throughout June and July 2020.  They finally found a provider, First Day Home Care, and C.K.'s mother signed a services contract with that provider on July 30, 2020.

First Day began providing community living supports services on August 11, 2020.  Services continued smoothly until around September 24, 2020, when First Day reported that it was short-staffed and could not provide C.K. all his service hours.  Then, on October 6, 2020, two First Day staff members requested to be removed from C.K.'s care.  The following day, the OCHN unsuccessfully sought community living support services staffing from about nine providers.  C.K.'s attorneys then contacted OCHN, expressing concern that the defendants failed to uphold their end of the settlement bargain.  Counsel for the OCHN responded on October 14, 2020, stating that "the settlement agreement obligating MORC to provide staffing is no longer applicable"

because the OCHN "resumed responsibility for maintaining provider network contracts" in October 2019 and because the OCHN "does not employ Direct Support Professionals and . . . is not obligated to do so to meet the needs of any one person."  Letter from OCHN counsel dated Oct. 14, 2020, ECF No. 13-6, PageID.263.  OCHN counsel also contended that the pandemic constituted a *force majeure* impacting its ability to provide in-home supports and associated contractual obligations.  It also pointed out that many of C.K.'s service providers resigned or refused to continue providing in-home services for reasons including inappropriate comments and behavior by C.K.'s family members.  However, counsel assured the plaintiff that OCHN's efforts to provide C.K.'s services would continue.

First Day officially stopped providing services for C.K. on October 23, 2020.  The OCHN unsuccessfully tried to secure staffing throughout October and November.  It formally updated the MDHHS about its failed efforts to fulfill C.K.'s services needs on November 9, 2020.  Its ineffective efforts continued through December 2020.

C.K.'s mother expressed growing concern for her son and the safety of her family over the lack of help.  C.K. turned 15 years old and weighed about 195 pounds.  He had assaulted service providers, and he punched his mother in the ribcage, knocking the wind out of her and leaving a bruise that lasted two weeks in October 2020.  He also assaulted his grandmother.  In December, he had an episode over moving his bed; he threw a lamp at his mother and tried to break down the door to his room.  Whenever his mother called for intensive crisis stabilization services, the provider usually did not send anyone and just told her to call 9-1-1.  C.K.'s mother observed that "CK's behavior has worsened substantially since [community living supports] and Respite services stopped.  He is more aggressive more frequently [and] does not have appropriate staff to teach him

the skills he needs to be as independent as possible." *Id.*, ¶ 62 at PageID.96-97.   She expressed

worry that C.K. will pose too much of a danger to his grandmother, who provided their only home.

D.

C.K.'s mother filed the present action on C.K.'s behalf in December of last year.   The plaintiff asks for (1) a declaration that the defendants violated the settlement agreement; (2) an order requiring the defendants' specific performance of the settlement agreement's terms; (3) the imposition of a monetary penalty for each day the defendants fail to comply with the Court's order; (4) the appointment of an independent monitor to ensure the defendants' compliance with the agreement; and (5) an award of attorney's fees.

After the complaint was filed, the OCHN secured a new service provider for C.K., New Horizons, which began providing community support services for C.K. on January 4, 2021. However, C.K. threw a VHS tape at a worker's neck and punched her on January 15, 2021, causing New Horizons to stop serving C.K. on January 19, 2021.

About two weeks later, C.K. moved for a preliminary injunction to compel the defendants to comply with the 2018 settlement agreement.   The state defendants moved to dismiss the complaint about a month after that.

1.

The OCHN's Deputy Executive Director Dr. Nicole Lawson filed an affidavit in opposition to the preliminary injunction motion describing the OCHN's most recent efforts to provide C.K. with the services he needs.   She stated that by April 26, 2021, the parties expected that the Jewish Association for Residential Care (JARC) staff would cover C.K.'s community living supports hours, but "staffing fell through for three hours on Sunday."   The OCHN then added more service providers to assist C.K.; as of May 7, 2021, the OCHN hired JARC, Training and Treatment

- 8 -

Innovations (TTI), and Easter Seals to provide C.K. with his community living supports and respite services.  Beginning on May 16, 2021, TTI agreed to fill the open service hours on Sundays.  To staff C.K.'s requirements, the OCHN agreed to pay all staff working C.K.'s case a $300 staffing bonus every 90 days, and persons working on Sunday are being paid 1.5 times their normal hourly rate.

Marisa Springstead testified at the hearing that she and C.K. need the community living support and respite services by describing her difficult experiences living with C.K. and her attempts to address his disruptive and violent behavioral issues.  Dr. Anne Leisen, C.K.'s psychologist, described the systemic in-home worker shortage affecting service recipients like C.K.  She explained that the state system does not provide Springstead and C.K. access with the backup workers they seek due to those shortages.  However, Dr. Leisen testified that even if backup workers were available, they should not be used regularly because consistent in-home workers promote a staff rapport with C.K. and each new worker needs to be trained on C.K.'s individual plan of service before assisting him.  Additionally, Dr. Leisen cautioned that C.K. reacts poorly to unfamiliar workers; thus, exposing him to persistently changing workers may do more harm than good.   However, she also could not opine conclusively that temporary in-home service interruptions have caused, or will cause, C.K. irreparable harm.

Tyler Roebke, MORC's general counsel and compliance officer, explained that after the Court approved the parties' settlement agreement, the MORC's performance duties for the OCHN changed: MORC is no longer responsible for contracting with in-home service providers; OCHN assumed that function.  According to Roebke, the OCHN assumed the MORC's staffing function referred to in the settlement agreement.

Marisa Springstead filed a post-hearing affidavit stating that there remains no backup plan in place to provide C.K.'s services if a worker misses a shift for any reason. She expressed doubt about the OCHN's new arrangements as C.K. lacked staff for four of the eight hours scheduled on May 15, 2021 and lacked staff for three of the scheduled hours on May 16, 2021.

2.

In their motion to dismiss, the state defendants argue that the plaintiff's complaint is defective because (1) the settlement agreement obliges them to pay money to the plaintiff, which they have done, but it does not require the MDHHS or other state defendants to enforce or oversee the OCHN's compliance with the terms of the settlement agreement; (2) there is no language in the settlement agreement requiring the state defendants to enter into or enforce contractual terms with the MORC, because that obligation rests exclusively on the OCHN; and (3) C.K.'s arguments regarding the adequacy of the agreed-upon services states no claim against the state defendants because they never agreed to provide services to C.K. directly, and they have no involvement in the creation or modification of a beneficiary's individual plan of service.

II.

The state defendants move for dismissal under Federal Rule of Civil Procedure 12(b)(6). To survive a motion to dismiss under that rule, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 547 (2007)). A "claim is facially plausible when a plaintiff 'pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Matthew N. Fulton, DDS, P.C. v. Enclarity, Inc.*, 907 F.3d 948, 951-52 (6th Cir. 2020) (quoting *Iqbal*, 556 U.S. at 678). When reviewing the motion, the Court "must 'construe the complaint in the light

most favorable to the plaintiff[] [and] accept all well-pleaded factual allegations as true.'" *Id.* at 951 (quoting *Hill v. Snyder*, 878 F.3d 193, 203 (6th Cir. 2017)).

When deciding a motion under Rule 12(b)(6), the Court looks to the pleadings. *Jones v. City of Cincinnati*, 521 F.3d 555, 562 (6th Cir. 2008). The Court also may consider the documents attached to them, *Commercial Money Ctr., Inc. v. Illinois Union Ins. Co.*, 508 F.3d 327, 335 (6th Cir. 2007) (citing Fed. R. Civ. P. 10(c)), documents referenced in the pleadings that are "integral to the claims," *id.* at 335-36, documents that are not mentioned specifically but which govern the plaintiff's rights and are necessarily incorporated by reference, *Weiner v. Klais & Co., Inc.*, 108 F.3d 86, 89 (6th Cir. 1997), *abrogated on other grounds by Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506 (2002), and matters of public record, *Northville Downs v. Granholm*, 622 F.3d 579, 586 (6th Cir. 2010); *see also Cates v. Crystal Clear Tech., LLC*, 874 F.3d 530, 536 (6th Cir. 2017) (instructing that "'[w]hen a written instrument contradicts allegations in the complaint to which it is attached, the exhibit trumps the allegations.'") (quoting *Williams v. CitiMortgage, Inc.*, 498 F. App'x 532, 536 (6th Cir. 2012)). However, beyond that, assessment of the facial sufficiency of the complaint ordinarily must be undertaken without resort to matters outside the pleadings. *Wysocki v. Int'l Bus. Mach. Corp.*, 607 F.3d 1102, 1104 (6th Cir. 2010).

The complaint does not separate counts, but, after reciting the failures to furnish certain services over the past year or more, it alleges that "the defendants" breached the settlement agreement in one or more ways. The plaintiff does not differentiate among the several defendants or identify which of them assumed the specific obligation under the settlement agreement. Instead, the plaintiff asserts that the settlement agreement binds all defendants to all obligations set out therein.

- 11 -

A settlement agreement is nothing more than a contract, and it is "governed 'by reference to state substantive law governing contracts generally.'"  *Cogent Sols. Grp., LLC v. Hyalogic, LLC*, 712 F.3d 305, 309 (6th Cir. 2013) (citations omitted).  As essentially a state law contract claim, a suit for breach of a settlement agreement "requires its own basis for jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 378 (1994).  The parties' citizenship is not diverse, so jurisdiction under 28 U.S.C. § 1332 is not an option.  However, subject matter jurisdiction is satisfied by the Court's explicit retention of jurisdiction in the prior lawsuit's dismissal order to enforce the settlement agreement.  *RE/MAX Int'l, Inc. v. Realty One, Inc.*, 271 F.3d 633, 643 (6th Cir. 2001) (holding that "*Kokkonen* only requires a reasonable indication that the court has retained jurisdiction, 'such as a provision "retaining jurisdiction" over the settlement agreement'").  !

Courts applying Michigan contract law interpret such agreements with the main purpose of "honor[ing] the intent of the parties."  *Evoqua Water Techs., LLC v. M.W. Watermark, LLC*, 940 F.3d 222, 229 (6th Cir. 2019) (quoting *Rasheed v. Chrysler Corp.*, 445 Mich. 109, 127, n.28, 517 N.W.2d 19, 29 n.28 (1994)).  To discern that intent, a court "must look for the intent of the parties in the words used in the instrument." *Mich. Chandelier Co. v. Morse*, 297 Mich. 41, 49, 297 N.W. 64, 67 (1941).  When those words are clear and unambiguous, the contract — the settlement agreement — must "be enforced as written unless a contractual provision violates law or public policy."  *Rory v. Cont'l Ins. Co.*, 473 Mich. 457, 491, 703 N.W.2d 23, 43 (2005).

The state defendants insist that the settlement agreement's language, set out above, binds them only to a single obligation: to pay C.K. $16,250, which they did.  The plaintiff counters that the state defendants maintain ongoing duties to oversee the administration of C.K.'s benefits because they are responsible for administering Michigan's Medicaid plan under 42 U.S.C. §

1396a(a)(5) and because the parties entered into the settlement agreement to resolve alleged problems with the administration of that plan.  That argument founders, however, because the complaint does not plead a violation of any statutory duty, and the plaintiff cannot point to any language in the settlement agreement that creates an obligation that the state defendants failed to fulfill.

The critical paragraphs of the agreement, numbered paragraphs 3 and 4, list the services that will be provided to C.K.  The drafters of that agreement, however, employed the passive voice, so it is not clear who it is that bears responsibility for furnishing those services.  (E.g., "[ICCS] *has been added* to CK's [IPS] . . ."; "These services *will be provided* . . .") (emphasis added).  The agreement specifically assigns to the OCHN the responsibility of requiring certain contract requirements in its downstream agreements with service providers.  But, aside from the obligation to pay money, the language of the settlement agreement does not impose any obligations on the state defendants to provide any services.

The state defendants suggest that the absence of mandatory language directed against them is no oversight, because they are not in the business of providing direct mental and behavioral health treatment and services to individuals like C.K.  The plaintiff maintains that does not matter because the only reason that is the case is because the state defendants made it so, and federal law does not require the single state agency to contract out the provision of services.  The plaintiff puts some weight on a statement in the agreement that the enumerated services will be furnished "in accordance with the Michigan Medicaid Provider Manual."  But that language cannot withstand the heavy burden the plaintiff places on it.  There is no mention in the complaint, the settlement agreement, or the Michigan Medicaid Provider Manual that the MDHHS is appropriately

considered a service provider itself. And the plaintiff has not cited any language from the Provider Manual that places the obligation to furnish those services with any of the state defendants.

The only allegation in the complaint against the state defendants is that they failed to require the "OCHN to comply with the terms of the settlement," a breach of a duty that the plaintiff believes derives from the state defendants' obligation to oversee the Medicaid program and their participation in the settlement. Although the MDHHS is responsible for overseeing the administration of Medicaid services, that obligation is statutory, not contractual. *See K.B. by Next Friend T.B. v. Michigan Dep't of Health and Human Servs.*, 367 F. Supp. 3d 647, 655-57 (E.D. Mich. 2019). The claim in this case essentially is for breach of contract. Nowhere in the settlement agreement did the parties agree that the MDHHS must enforce the OCHN's compliance with it.

The plaintiff has not pointed to a provision of the settlement agreement that the state defendants breached. Therefore, his complaint fails to state a claim for relief against those defendants, and it will be dismissed as to them.

III.

In his motion for a preliminary injunction, the plaintiff asks for an order "[e]njoin[ing] Defendants from refusing to comply with the terms of the settlement agreement," enjoining the OCHN "from failing to enforce contract provisions with . . . MORC that require MORC to use their [*sic*] own staff to provide Plaintiff's CLS and Respite services," and enjoining OCHN "from failing to provide Intensive Crisis Stabilization Services to Plaintiff." Mot. For Prelim. Inj., ECF No. 13, ECF No. 66-67. OCHN argues that the plaintiff has not shown that it breached the settlement agreement, and it acted with reasonable promptness in light of the difficulties imposed by the pandemic. In its post-hearing brief, OCHN contends that it has fully staffed C.K.'s service hours and that it complied with Medicaid's "reasonable promptness" requirements in light of the

pandemic shutdowns, systemic in-home worker shortage in the county and state, long distance travel to the plaintiff's house, and C.K.'s aggression to staff.

A preliminary injunction is an extraordinary, discretionary, "equitable remedy," that "may only be awarded upon a clear showing that the [plaintiff] is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 22 (2008) (citation omitted); *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000). Courts consider and balance four factors: (1) the movant's likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) substantial harm to others if the injunction is issued; and (4) the public interest served by the injunction. *Memphis A. Philip Randolph Inst. v. Hargett*, 978 F.3d 378, 385 (6th Cir. 2020) (quoting *Am. Civil Liberties Union Fund of Mich. v. Livingston Cnty*., 796 F.3d 636, 642 (6th Cir. 2015)).

## A.

Although courts describe the preliminary injunction inquiry as a balancing test, *see Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007), demonstration of a strong likelihood of success generally is a predominating factor. *Wilson v. Williams*, 961 F.3d 829, 844 (6th Cir. 2020); *Liberty Coins, LLC v. Goodman*, 748 F.3d 682, 689 (6th Cir. 2014) ("the likelihood of success on the merits often will be the determinative factor."). The plaintiff contends that the OCHN defendants breached the settlement agreement's provisions relating to crisis stabilization services and also community living support and respite services.

## 1.

The settlement agreement says that intensive crisis stabilization services "will be provided . . . through New Oakland or another appropriate ICSS provider . . . in accordance with the

Michigan Medicaid Provider Manual.  Response time within Oakland County will be one hour with the exception of unforeseen circumstances (which will be no more than 2 hours)." Settlement Agreement, ECF No. 1-2, PageID.23.  The plaintiff contends that the defendants breached this provision on a number of occasions.  He contends that the OCHN should have ensured that intensive crisis stabilization services are provided "when CK has a crisis by arriving with a mobile unit, implementing the intervention plan, and deescalating the situation.  Instead, [the service providers] often [did] not respond to [C.K.'s mother] at all" or told her to dial 9-1-1.

Once again, the unfortunate use of the passive voice requires some interpretation to determine whose obligation it is to ensure that the plaintiff receives crisis services within "one hour."  Paragraph 7 provides an assist, stating that the services "will be placed through Safehaus in Warren, Michigan and/or other sites as contracted by OCHN."  Settlement Agreement, ECF No. 1-2, PageID.23.  Moreover, C.K.'s individual plan of service referenced in the agreement is developed by the MORC, which contracted with the OCHN to provide C.K.'s services.  IPOS, ECF No. 13-3.

The OCHN never responded to this argument either in its written response to the motion or at oral argument.  During that hearing, C.K.'s mother testified that intensive crisis stabilization services were not furnished as required: "They don't come out to intervene . . . like they are supposed to even before COVID; they wouldn't return phone calls to the next day, two hour wait time, psychiatrist would show up, and then security, they c[an't] come in the until security shows, so that would be 45 minutes to an hour and at the time PRN [sic] would either be working or were able to redirect after three, four hours waiting for intervention."  OCHN did not address Springstead's testimony in its post-hearing brief.

- 16 -

Considering the OCHN defendants' failure to provide evidence of compliance or even address the argument, it is easy to conclude that the plaintiff established a strong likelihood of success on the merits of his breach of contract claim with respect to the lack of intensive crisis stabilization services.  *See Music v. Arrowood Indem. Co.*, 632 F.3d 284, 286 n.1 (6th Cir. 2011) (failing to address an argument in briefing or at oral argument constitutes an abandonment of the claim or defense).

2.

It also is quite evident that the OCHN defendants breached the settlement agreement by failing to provide community living support and respite services.  The OCHN agreed to "enforce contract provisions with MORC to supply its own staff on those occasions where a sub-contracted provider cannot" provide community living support or respite services.  Settlement Agreement, ECF No. 1-2, PageID.23.  Despite that clear obligation, there is no evidence that when C.K.'s service providers dropped out, the OCHN ever tried to compel the MORC to provide C.K.'s services itself.

The OCHN defendants do not deny this.  Instead, they argue that: (1) federal law does not require the OCHN to provide C.K.'s services; (2) the Court should read a "reasonable promptness" standard into the service provision requirement; (3) C.K.'s poor behavior served as an obstacle to the OCHN's performance; and (4) the OCHN's contract with MORC dissolved, rendering the performance of that provision impossible.  None of these points, however, excuse the OCHN's failure of performance.

Citing *Brown v. Tennessee Department of Finance and Administration*, 561 F.3d 542, 545 (6th Cir. 2009), the OCHN attempts to avoid its responsibility by focusing on a provision in the Social Security Act, 42 U.S.C. § 1396a(a)(8), by suggesting that it requires only that it pay for the

- 17 -

listed services, not to ensure that they actually are delivered.  That may be true, but it is beside the point.  The plaintiff does not rely on the Social Security Act in this case.  The complaint alleges a breach of the parties' settlement agreement, which expressly sets forth the OCHN's contractual obligation to ensure that C.K.'s services are provided.

The OCHN cites *Brown* again in support of its contention that the settlement must be read to include a "reasonable promptness" limitation on its obligation to furnish the services.  And applying that test, it believes, requires consideration of the urgency of C.K.'s needs, his welfare, and the nature of the services.  *See Hanley v. Zucker*, No. 15-5958, 2016 WL 3963126, at \*3 (S.D.N.Y. July 21, 2016)); *see also Ciaramella v. Zucker*, No. 18-6945, 2019 WL 4805553, \*10 (S.D.N.Y., Sept. 30, 2019).   But again, the settlement agreement does not reference any "reasonable promptness" requirement, nor does it even reference the Social Security Act.  Reading such a requirement into the parties' agreement would collide with Michigan contract law, which generally requires that an "unambiguous contract . . . be enforced as written."  *Rory*, 473 Mich. at 491, 703 N.W.2d at 43; *Terrien v. Zwit,* 467 Mich. 56, 75-76, 648 N.W. 2d 602, 612 (2002) (rejecting the dissent's position "that the lack of an explicit internal definition of a [contractual] term somehow equates to ambiguity . . . [that] allows a court free rein to conclude that a contract means whatever the court wants it to mean.").

Even if the Court were to engraft a reasonableness requirement onto the agreement, the plaintiff established that the provision of C.K.'s Medicaid services was not reasonably prompt. The record shows that C.K. went without services for several months from October 23, 2020 to January 3, 2021, with his needs only partially addressed before that time and with delays in services after January until May (not including the pandemic-related lapse in services from March through August 2020).

The OCHN insists that the Court must account for the fact that C.K.'s residence was far away from service providers; COVID-19 reduced staff availability; C.K.'s disabilities were unique; there were several service providers refusing to accept new referrals; and there was a dearth of available caregivers. Those factors, however, should have been taken into account, as much as reasonably possible, when the settlement was drafted. Certainly, the parties could not predict the pandemic, but the fact that C.K. lives in an inconvenient location does not constitute a justification for a breach of contract. The pandemic, perhaps, may lend support to a claim of impossibility of performance. *See Karl Wendt Farm Equip. Co., Inc. v. Int'l Harvester Co.*, 931 F.2d 1112, 1116-17 (6th Cir. 1991) (Under Michigan law, "the doctrine of impossibility is a valid defense not only when performance is impossible, but also when supervening circumstances make performance impracticable.") (citing *Bissell v. L.W. Edison Co*., 9 Mich. App. 276, 156 N.W.2d 623 (1967)). However, according to the OCHN, the "MORC reported ongoing staffing shortages due to the pandemic" "[f]rom March 19 through March 30, 2020." OCHN Response, ECF No. 21, PageID.202. The OCHN never alleged that the MORC experienced staffing shortages after March 30.

The OCHN also argues that C.K. must bear some responsibility for the lapses in his services because he was a difficult customer who even assaulted a service worker. They rely on *Harbor Park Market, Inc. v. Gronda*, 277 Mich. App. 126, 131-132, 743 N.W.2d 585, 588-89 (2007), for the contention that a contracting party is legally precluded from placing obstacles in the way of his counterpart's performance. *Gronda* does not support that argument under these facts. That case dealt with a failed attempt to purchase liquor licenses. It held that "when a contract contains a condition precedent, there is an implied agreement that the promisor will place no obstacle in the way of the happening of such event"; and if the promisor does prevent "the

occurrence of a condition, the party in effect, waives the performance of the condition." *Ibid.* Here, there is no evidence that C.K. interfered with a condition precedent in the settlement agreement. The only plausible condition to the defendants' performance is a finding that C.K.'s services are medically necessary, which no one disputes. Moreover, C.K.'s behavioral outbursts are one of the main reasons that he requires these support services to begin with.

Finally, when plaintiff's counsel contacted the OCHN in October 2020, its attorney responded in a letter that "the settlement agreement obligating MORC to provide staffing is no longer applicable" because the OCHN "resumed responsibility for maintaining provider network contracts" in October 2019 and because the OCHN "does not employ Direct Support Professionals and [] is not obligated to do so to meet the needs of any one person." Letter from OCHN Counsel dated 10/14/2020, ECF No. 13-6, PageID.263. The lapse in a contractual relationship between the OCHN and the MORC does not excuse the former's performance, however. Although Michigan law recognizes the defense of supervening impossibility, "there must be a showing of 'impracticability because of extreme and unreasonable difficulty, expense, injury or loss involved.'" *Roberts v. Farmers Ins. Exchange*, 275 Mich. App. 58, 74, 737 N.W.2d 332, 342 (2007) (quoting *Bissell v. L.W. Edison Co.*, 9 Mich. App. 276, 284, 156 N.W.2d 623, 626 (1967)). "Subsequent events which in the nature of things do not render performance impossible, but only render it more difficult, burdensome, or expensive, will not operate to relieve [a] party of its contractual obligations." *Chase v. Clinton Cnty.*, 241 Mich. 478, 484, 217 N.W. 565, 567 (1928); *see also Milligan v. Haggerty*, 296 Mich. 62, 295 N.W. 560 (1941) (rejecting impossibility defense because subsequent market conditions rendered the performance unprofitable). The question of impossibility "'may depend upon whether the supervening event producing impossibility was or was not reasonably foreseeable when [the party in breach] entered into the contract.'" *Roberts*,

- 20 -

275 Mich. App. at 74, 737 N.W.2d at 342 (quoting *Bissell*, 9 Mich. App. at 284, 156 N.W.2d at 626). The OCHN defendants offered no evidence on this.

The alleged impossibility of requiring MORC to provide backup services "does not fall within the scope of circumstances encompassed by the doctrine of impossibility," which generally "is limited to the destruction of the means of performance by an act of God, vis major, or by law." *Alliant Tax Credit Fund 31-a, Ltd v. Taylor 8 Assocs. LLC*, No. 08-12938, 2009 WL 691900, at *3 (E.D. Mich., Mar. 12, 2009) (citation and quotation marks omitted); *accord Vowels v. Arthur Murray Studios of Michigan, Inc.*, 12 Mich. App. 359, 163 N.W.2d 35 (1968) (allowing rescission of contract for dance lessons due to subsequent closing of the dance studio). Tyler Roebke, MORC's general counsel and compliance officer, testified that nothing prevents the entities from re-entering into a contract. The problem arose from OCHN's own contractual relations with the MORC. The termination of that contract was not so unforeseeable as to justify the impossibility defense. *Roberts*, 275 Mich. App. at 74, 737 N.W.2d at 342. Moreover, after the contract purportedly dissolved, the OCHN represented to the MDHHS that it "continues to receive weekly updates of MORC's good-faith efforts to identify staffing for [C.K.]. . ." OCHN Letter to MDHHS dated 11/09/2020, ECF No. 21-6.

The OCHN defendants have not presented a valid excuse for its failure to furnish the community living support and respite services called for in the settlement agreement.

\* \* \*

The plaintiff has established a strong likelihood of success on both aspects of his breach of contract claim.

B.

Like demonstrating likely success on the merits, a showing of irreparable harm is "indispensable: If the plaintiff isn't facing imminent and irreparable injury, there's no need to grant relief *now* as opposed to at the end of the lawsuit." *D.T. v. Summer Cnty. Schools*, 942 F.3d 324, 326-27 (6th Cir. 2019); *see also Winter*, 555 U.S. at 22. A "delay or denial of Medicaid benefits can amount to irreparable harm." *Markava v. Haveman*, 168 F. Supp. 2d 695, 718 (E.D. Mich. 2001) (citing *Malloy v. Eichler*, 628 F. Supp. 582 (D. Del. 1986)). The Sixth Circuit has held that evidence showing "severe regression" of symptoms in children due to a lack of behavioral health services can constitute irreparable harm. *Parents' League for Effective Autism Servs. v. Jones-Kelley*, 339 F. App'x 542, 552 (6th Cir. 2009).

C.K. has been diagnosed with Autism Spectrum Disorder "with overlapping symptomology associated with obsessive compulsive disorder, hyperactivity, emotional dysregulation, and conduct disturbances." C.K. Mental Health Assessment, ECF No. 13-4, PageID.113. His individual plan of service was developed to "improve healthy relational boundaries with [his] parent, supports, and peers, work through fears and insecurities of rejection, increase personal autonomy reducing dependency and controlling behavior towards his mom, and tolerating delayed gratification." *Id.* at 127. He contends that he will suffer irreparable harm absent an injunction mandating the defendants to provide his agreed-upon services, which have diminished substantially since the Court convened a hearing on the matter.

The plaintiff acknowledges that the restoration of his services will obviate the need for this motion, but he and his mother remain skeptical about the defendants' assurances. Since the parties filed their original briefs on this motion, the OCHN acquired more service providers (JARC, TTI, and Easter Seals) to provide C.K. with his community living support and respite services, and

- 22 -

starting on May 16, 2021, TTI agreed to fill C.K.'s open hours on Sunday.  However, Springstead submitted an affidavit informing the Court that C.K. missed four service hours on May 15, 2021, and four hours on May 16, 2021.  And during the argument on the state defendants' motion to dismiss last week, the parties informed the Court that the situation has not improved and C.K. continues to go without the services promised by the settlement agreement.

Dr. Anne Leisen, C.K.'s psychologist, testified that she could not state definitively that missing several hours sporadically would irreparably harm C.K.  She also expressed concern about replacing service providers with people C.K. is unfamiliar with.  But C.K. raised a compelling argument that his condition has regressed during the period without community living support and respite services from October 2020 to January 2021.   And it appears now that the new service providers the OCHN promised have not delivered, even when the OCHN paid them extra to care for C.K.

Moreover, the record remains unclear about why the defendants have not sent anyone to assist appropriately when C.K.'s mother called for help.  Without intensive crisis stabilization services, it is not hard to imagine that C.K. will pose a heightened risk of danger to himself or others, as he repeatedly demonstrated violent tendencies against his family.  If C.K. has a crisis without support, there is a strong likelihood that he could cause harm to himself or his family.

The plaintiff has made a satisfactory showing of irreparable harm.

### C.

The final two factors — assessing the harm to others and weighing the public interest — "merge when the Government is the opposing party'" because the government shares the same interests as the public.  *Wilson v. Williams*, 961 F.3d 829, 844 (6th Cir. 2020) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

These factors weigh in C.K.'s favor.  The request for relief is simply that the defendants uphold their end of the bargain to provide C.K. with his medically necessary support services.  In the prior lawsuit, the plaintiff alleged that he was entitled to these services by law, and the settlement agreement all but confirmed that.  The public interest is served when the agencies of government deliver the services that the law authorizes.  And the public is served when government settles lawsuits without litigation.  *See, e.g., Aro Corp. v. Allied Witan Co.,* 531 F.2d 1368, 1372 (6th Cir. 1994) ("Settlement agreements should . . .  be upheld whenever equitable and policy considerations so permit.  By such agreements are the burdens of trial spared to the parties, to other litigants waiting their turn before over-burdened courts, and to the citizens whose taxes support the latter.").

The defendants contend that the added expense of ensuring that C.K. receives his services, which may include paying premium wages for service providers, should weigh against a mandatory injunction compelling compliance with the settlement agreement.  However, the costs to C.K. and his family of being deprived of these services — particularly the crisis stabilization services — outweigh any inconvenience or cost to the State in ensuring that C.K. receives them.  *See Bontrager v. Indiana Fam. and Soc. Servs. Admin.*, 697 F.3d 604 (7th Cir. 2012) ("Although we are mindful of potential budgetary concerns, these interests do not outweigh Medicaid recipients' interest in access to medically necessary healthcare.").

Citing *University of Texas v. Camenisch*, 451 U.S. 390, 395 (1981), and *Ohio Coalition for Homeless & Service Employees International Union, Local 1199 v. Blackwell,* 467 F.3d 999, 1006 (6th Cir. 2006), the defendants argue that courts disfavor mandatory injunctions that require affirmative action on the part of the non-movant rather than preserving the status quo.  However, although the Sixth Circuit is wary of "mandatory injunction[s] that do[] not preserve the status

quo," *Blackwell,* 467 F.3d at 1006, it has held "that the difference between mandatory and prohibitory injunctive relief does not warrant application of differing legal standards" and expressly rejected the "Tenth Circuit's 'heavy and compelling' standard," upon which the defendants rely. *United Food & Com. Workers Union, Local 1099 v. Sw. Ohio Reg'l Transit Auth.*, 163 F.3d 341, 348 (6th Cir. 1998) (citing *Schrier v. Univ. of Colorado*, 427 F.3d 1253, 1259 (10th Cir. 2005)).

Next, the defendants argue that this is a private dispute, and the public has no interest in whether C.K. receives any of his services. That is incorrect. The public and the state have an interest in Medicaid recipients receiving treatment, and the services impact not only C.K., but also the lives of his family members and, potentially, members of his community as well. As plaintiff's counsel aptly points out, if C.K.'s behavior worsens due to a lack of services and C.K. must be treated in a more restrictive setting, the public will bear the added cost of institutionalization.

The defendants insist that they are doing the best they possibly can with the resources they have, and that no court order could create service providers ready to start working with C.K. But that is the obligation that the OCHN defendants assumed under the settlement agreement. It is true that the plaintiff has pointed out instances where he has not received all of his service hours in a weekend, or that there was an occasional missed appointment. That, however, is not the main focus of his motion. His principal concern is the lack of regular, consistent care, which he has missed for weeks and months at a time. That at base is the source of his feared irreparable harm.

The plaintiff has suggested solutions that address the systemic flaws that have led to the breakdown in furnishing service providers on a consistent, regular basis. For instance, OCHN could pay an enhanced rate to a designated employee, who would be trained to address C.K.'s IPOS, to cover a community living support services shift when a regular provider was unable to

work.  OCHN could pay an enhanced rate to staff that currently work on C.K.'s case (and are familiar with his services) when they are called upon to cover on short notice.  All of this, of course, would be intended to maintain C.K in his home in fulfillment of the mandates of federal and state law.  But more to the point of this case, OCHN has assumed the obligation to furnish these support services in the settlement agreement.

IV.

The plaintiff has not stated a claim against the state defendants for which relief can be granted.  The factors governing the issuance of a preliminary injunction favor the plaintiff.

Accordingly, it is **ORDERED** that the motion to dismiss by defendants Michigan Department of Health and Human Services, Robert Gordon, and Governor Gretchen Whitmer (ECF No. 22) is **GRANTED**.

It is further **ORDERED** that the plaintiff's motion for a preliminary injunction (ECF No. 13) is **GRANTED IN PART**.

It is further **ORDERED** that defendants Oakland Community Health Network and Dana Lasenby are **RESTRAINED AND ENJOINED**, during the pendency of this case or until further order of the Court, from refusing to comply with the terms of the settlement agreement reached in case 17-11988; from failing to enforce contract provisions with Macomb-Oakland Regional Center (MORC) that require MORC to use their own staff to provide Plaintiff's CLS and Respite services; and from failing to provide Intensive Crisis Stabilization Services to plaintiff C.K. within the time parameters set forth in the settlement agreement.

It is further **ORDERED** that no bond is required because the OCHN defendants have assumed these obligations in the settlement agreement, and furnishing these services is in the public interest.

It is further **ORDERED** that the parties must file a joint report with the Court on or before September 24, 2021 that describes the status of the services required herein.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:   August 25, 2021