UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

CK, by his Next Friend
Marisa Springstead,

       Plaintiffs,

v

OAKLAND COMMUNITY HEALTH
NETWORK; and DANA LASENBY, Director of
Oakland Community Health Network,
in her official capacity,

       Defendants.

_____ /

Case No:  20-13301

Honorable David M. Lawson

Magistrate Judge R. Steven Whalen

Simon Zagata (P83162)
Chris E. Davis (P52159)
Disability Rights Michigan
Attorneys for Plaintiff
4095 Legacy Parkway
Lansing, MI 48911
(517) 487-1755
szagata@drmich.org
cdavis@drmich.org

Matthew J. Boettcher (P40929)
Plunkett Cooney
Attorneys for Defendants
Oakland Community Health Network
and Dana Lasenby
38505 Woodward Avenue, Suite 100
Bloomfield Hills, MI 48304
mboettcher@plunkettcooney.com
(248) 901-4035

_____ /

## **PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Pursuant to Local Rule 7.1(a), on October 22, 2021, Plaintiff's attorneys contacted Defendants' counsel, seeking their concurrence on this Motion. Defendants did not concur in the Motion. Plaintiff moves for summary judgment pursuant to Fed. R. Civ. P. 56. Plaintiff makes this Motion on the grounds that there is no genuine issue of material fact regarding Plaintiff's claim that

Defendants OCHN and Lasenby violated the terms of the previous settlement agreement ("Settlement"). ECF No. 1-2.

Defendants clearly violated the Settlement by failing to provide, or arrange for the provision, of services outlined in Plaintiff CK's Individual Plan of Service ("IPOS"), failing to contract with Macomb Oakland Regional Center, Inc. ("MORC") as the Settlement requires, and failing to require that providers of CK's Community Living Support ("CLS") and/or Respite services give notice or identify another provider prior to discontinuing services for CK. These failures are well-established on the record and Defendants' vague statements that they are "doing everything they can" are both untrue and not a legitimate defense to Plaintiff's claim.

Therefore, and for the reasons set forth more fully in its Brief in Support, Plaintiff respectfully requests this Honorable Court grant its Motion, enter an Order compelling OCHN to comply with the terms of the Settlement and award such further relief as may be appropriate.

Respectfully submitted,

Dated: October 22, 2021

/s/ Simon Zagata
Simon F. Zagata (P83162)
Disability Rights Michigan
Attorney for Plaintiffs
4095 Legacy Parkway
Lansing, MI 48911
(517) 487-1755

2

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

CK, by his Next Friend                      Case No:  20-13301
Marisa Springstead,

                                            Honorable David M. Lawson
        Plaintiffs,

                                            Magistrate Judge R. Steven Whalen
v.

OAKLAND COMMUNITY HEALTH
NETWORK and DANA LASENBY, Director of
Oakland Community Health Network,
in her official capacity,

        Defendants.
_____/

Simon Zagata (P83162)               Matthew J. Boettcher (P40929)
Chris E. Davis (P52159)             Plunkett Cooney
Disability Rights Michigan          Attorneys for Defendants
Attorneys for Plaintiff             Oakland Community Health Network
4095 Legacy Parkway                 And Dana Lasenby
Lansing, MI 48911                   38505 Woodward Avenue, Suite 100
(517) 487-1755                      Bloomfield Hills, MI 48304
szagata@drmich.org                  mboettcher@plunkettcooney.com
cdavis@drmich.org                   (248) 901-4035

_____/

## BRIEF IN SUPPORT OF PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

# **TABLE OF CONTENTS**

Index of Authorities ...............................................................................ii

Statement of Issues Presented ...........................................................iii

Most Appropriate Authority .................................................................iv

Statement of Facts ...................................................................................1

     I.      Argument ...................................................................................3

          A.     DEFENDANT OCHN BREACHED THE SETTLEMENT ...........3

          B.     DEFENDANT OCHN HAS PRACTICAL, COMMON-SENSE WAYS TO COMPLY WITH THE SETTLEMENT ................................................................................7

Conclusion .................................................................................................12

Certification ..............................................................................................15

Certificate of Service .............................................................................15

# INDEX OF AUTHORITIES

**Cases**:

*Bissell v. L.W. Edison Co.*
    9 Mich. App. 276 (1967)...............................................................................8

*Cogent Sols. Grp., LLC v. Hyalogic, LLC*
    712 F.3d 305 (6th Cir. 2013) ......................................................................4

*Roberts v. Farmers Ins. Exchange*
    275 Mich. App. 58, 737 N.W.2d 332 (2007)...............................................8

*Rory v. Cont'l Ins. Co.*
    473 Mich. 457 (2005) ............................................................................4, 10

**Regulations**:

42 C.F.R. § 441.301(c)(1)(vi)..............................................................6, 7, 12

**Statutes**:

42 U.S.C. § 1395mm...........................................................................................2
42 U.S.C. § 1395mm(a)(1)(A)...........................................................................8
42 U.S.C. § 1395mm(b)(2)(D)...........................................................................8
42 U.S.C. § 1396b(m)........................................................................................2
M.C.L. § 400.109f..............................................................................................2

**Federal Regulations**:

Fed. R. Civ. P. 56(a)..........................................................................................3

## <u>STATEMENT OF ISSUES PRESENTED</u>

1.      Is there a lack of genuine dispute as to any material fact that Defendants

breached the Settlement such that Plaintiff is entitled to judgment as a matter of law?

Plaintiff Answers: Yes

Defendants Would Answer: No

## <u>MOST APPROPRIATE AUTHORITY</u>

*Roberts v. Farmers Ins. Exchange*
   275 Mich. App. 58 (2007)............................................................................8

*Rory v. Cont'l Ins. Co.*
   473 Mich. 457 (2005) ..........................................................................4, 10

## STATEMENT OF FACTS

Plaintiff is a 15-year-old Medicaid beneficiary authorized to receive home and community-based services through the Medicaid State Plan. ECF No. 13-2, PageID.89. Plaintiff lives in Oakland County and is a service recipient through MORC and Oakland Community Health Network ("OCHN"). ECF No. 13-2, PageID.89. In June of 2017, Plaintiff sued Michigan Department of Health and Human Services ("MDHHS"), OCHN, OCHN's executive director Willie Brooks, MDDHS' director Nick Lyon and Governor Rick Snyder, alleging violations of the Rehabilitation Act and the Americans with Disabilities Act. 2:17-cv-11988 ECF No. 1.

In April of 2018, the parties reached a settlement agreement resolving all claims. ECF No. 1-2. The settlement agreement requires Defendant OCHN to provide, or arrange for the provision, of the medically necessary services in CK's IPOS. ECF No. 1-2, PageID.23. To achieve this requirement, the settlement requires Defendant OCHN to enforce contract requirements with MORC requiring MORC to supply its own staff to provide CK's CLS and/or Respite services if a sub-contracted service provider cannot be found. ECF No. 1-2, PageID.23. The agreement also mandates that any contract with CLS and/or In-Home Respite providers for CK must contain clauses requiring notice or identification of other

1

willing providers before the service provider discontinues services. ECF No. 1-2, PageID.23.

Defendant OCHN is the designated prepaid inpatient health plan (PIHP) for Oakland County. 2:17-cv-11988 ECF No. 1, PageID.6-7; 2:17-cv-11988 ECF No. 18, PageID.155. OCHN is also a managed care organization ("MCO") under M.C.L. § 400.109f. 2:17-cv-11988, ECF No. 1, PageID.6-7; 2:17-cv-11988, ECF No. 18, PageID.155. The definition of MCO's includes health maintenance organizations or organizations with contracts under 42 U.S.C. § 1395mm. 42 U.S.C. § 1396b(m).

In October of 2019, OCHN, instead of MORC, began maintaining provider network contracts. ECF 13-6, PageID.136. OCHN continued to contract with MORC to provide Medicaid services, including supports coordination, CLS and Respite. (Exhibit 1, pp. 46, 50). MORC, under contract with Defendant OCHN, continued providing supports coordination and behavioral health services for CK. ECF 13-6, PageID.136.

Since at least March of 2020, Defendant OCHN has failed to provide or ensure provision of the CLS and/or Respite services in CK's IPOS. ECF No. 13-2. Up to and including the date of this filing, there have been significant gaps in CK's CLS and Respite services. ECF No. 13-2; ECF No. 44-1; ECF No. 50, PageID.545. Defendant OCHN admits that there are gaps in Plaintiff's IPOS services. ECF No.

50, PageID.545. Despite these gaps, Defendant OCHN has never required MORC to provide its own staff for CK's services. In addition, MORC's sub-contracted providers frequently cease providing the CLS and/or Respite in CK's IPOS without notice and without identifying a replacement provider. ECF No. 13-2, PageID.93. In fact, Defendant OCHN's contracts with CK's CLS and/or Respite providers do not contain the notice requirements the Settlement requires. (Exhibits 2 and 3).

OCHN's failure to provide the services in CK's IPOS causes significant harm to CK's mental health, the health of his family, and CK's ability to stay in his home. ECF No. 13-2, PageID.93-97.

## I.      ARGUMENT

Plaintiff is entitled to summary judgment because there is no genuine issue of material fact as to whether Defendant OCHN breached the Settlement. Fed. R. Civ. P. 56(a). The only true issue remaining in the case is whether tangible, court-enforceable steps remain for Defendant OCHN to comply with the Settlement. Despite OCHN's contentions that it is doing everything it can, it is not. Practical measures to comply with the Settlement remain. It is these that Plaintiff asks the Court to Order in granting this Motion for Summary Judgment.

### A.      DEFENDANT OCHN BREACHED THE SETTLEMENT

As this Court noted in its August 25, 2021 Opinion and Order, ECF No. 48, PageID.525, the Settlement at issue in this case is a contract, governed by

Michigan contract law. *Cogent Sols. Grp., LLC v. Hyalogic, LLC*, 712 F.3d 305, 309 (6th Cir. 2013) (citations omitted). When the terms of a contract are unambiguous, it must be enforced as written unless a contractual term violates the law or public policy. *Rory v. Cont'l Ins. Co.*, 473 Mich. 457, 491, 703 N.W.2d 23, 43 (2005). Here, the Settlement's terms are unambiguous: OCHN will ensure that CK's IPOS services are provided, OCHN will have contract provisions with MORC that require MORC to supply its own staff if there is no subcontracted provider for CLS and/or In-Home Respite, and OCHN's contracts with CLS and Respite providers will require those providers to provide notice and/or identify another provider before discontinuing CK's services. ECF No. 1-2, PageID.23.

Defendant OCHN unambiguously violated the Settlement. CK's mother, Marisa Springstead, detailed OCHN's failures to provide CK's IPOS services in her January 1, 2021 affidavit (ECF No. 13-2) and her May 18, 2021 affidavit (ECF No. 44-1). In these affidavits, Marisa describes large periods of time during which CK either had no CLS and/or Respite services or had fewer hours of those services than his IPOS prescribed. ECF No. 13-2; ECF No. 44-1. CK had no CLS or In-Home Respite providers from March 2020 to August 2020, October 23, 2020, to January 4, 2021, and from January 16, 2021, to January 21, 2021. ECF No. 13-2, PageID.91-97. As of September 24, 2021, CK was still missing the majority of his CLS and In-Home Respite hours. ECF No. 50, PageID. 545.

4

Instead of arguing that it has not breached the Settlement, Defendant OCHN argues that every staffing situation is fluid, and it is doing everything in its power to find staff for CK's case. *See* ECF No. 50, PageID.547-548. Though this may bear on the affirmative defense of impossibility/impracticability or whether the Court has options to order OCHN's compliance, both issues discussed below, it does not negate the fact that the service gaps are breaches of the Settlement.

Service gaps are not the only breach of the Settlement OCHN has committed. Defendant OCHN also promised that contracts with CLS and/or Respite providers for CK would require that providers give notice or identify another provider before discontinuing services. ECF No. 1-2, PageID.23. Neither OCHN nor its subcontractor MORC ever added the required terms to its contracts with CK's CLS or Respite providers. (Exhibits 2-4). Marisa Springstead's affidavit supports that this Settlement requirement is continually breached, as multiple staffing providers stopped providing services without notice or identifying another provider. ECF No. 13-2, PageID.92-93. Defendant OCHN has full control over these contract terms, as it took over contracts with CLS and Respite providers in October 2019. ECF No. 13-6. OCHN, having sole responsibility for contracting with CLS and Respite providers, only makes the breach more egregious, as OCHN no longer needs to go through a third-party, MORC, to ensure that the notice-before-termination contract provisions are in place for CK's providers.

The Settlement also requires OCHN to contract with MORC so that MORC will staff CK's IPOS service hours if a provider agency is unable to. ECF No. 1-2, PageID.23. At least until fiscal year 2020, OCHN continued to contract with MORC for the provision of CLS and Respite services. (Exhibit 1, pp. 46, 51). Even if OCHN now maintains contracts with other provider agencies for those services, it still has the capacity to contract with MORC, in compliance with the Settlement. In fact, OCHN still contracts with MORC for several of CK's services, including case management. ECF No. 13-3, PageID.104-105. Despite this, Marisa Springstead attests that MORC never sent their own staff to cover any of CK's services, in violation of the Settlement. ECF No. 13-2, PageID.93.

Defendant OCHN maintains that it would be illegal for MORC to provide CLS and Respite for CK, citing 42 C.F.R. § 441.301(c)(1)(vi), which prevents the same entity from providing both case management and direct-care home and community-based services ("HCBS") to an individual. ECF No. 50, PageID.548. 42 C.F.R. § 441.301(c)(1)(vi) is hardly a blanket prohibition on the practice. The regulation provides multiple ways to comply with the regulation and the Settlement. First, OCHN could contract with an entity besides MORC to provide CK's case management services or provide case management themselves. This way, MORC would not be the agency providing case management and HCBS to CK, and the prohibition would not apply.

6

42 C.F.R. § 441.301(c)(1)(vi) also allows the same entity to provide case management and HCBS services with Center for Medicaid and Medicare Services ("CMS") approval if the organization is the only willing and qualified entity to provide those services. Arguably, given the systemic lack of HCBS providers that Defendants claim and the well-documented difficulties staffing CK's case, MORC is the only entity in the area that is willing and qualified to provide case management and HCBS services. Despite this possibility, Defendant OCHN has not presented evidence that they have reached out to the State to inquire as to a waiver of § 441.301's requirements. Instead of finding an independent case management entity or seeking a waiver from the State, OCHN has instead refused to contract with MORC as the Settlement requires. This is an avoidable breach.

Given all of the above, no material fact exists as to whether OCHN breached the Settlement. As discussed below, there is no question that OCHN's compliance with the agreement is possible. Therefore, summary judgment is appropriate.

**B.    DEFENDANT OCHN HAS PRACTICAL, COMMON-SENSE WAYS TO COMPLY WITH THE SETTLEMENT**

As the Court noted in its Opinion and Order Granting in Part Motion for Preliminary Injunction, "The OCHN defendants have not presented a valid excuse for its failure to furnish the community living support and respite services called for in the settlement agreement." ECF No. 148, PageID.534. The defense of supervening impossibility applies in the limited context of when a situation

7

develops after a contract is formed which makes performance of the terms of the contract impossible or impracticable because of "…extreme and unreasonable difficulty, expense, injury, or loss involved." *Roberts v. Farmers Ins. Exchange*, 275 Mich. App. 58, 74, 737 N.W.2d 332, 342 (2007) (quoting *Bissell v. L.W. Edison Co.*, 9 Mich. App. 276, 284, 156 N.W.2d 623, 626 (1967)).

Though paying enhanced rates for CK's services is more expensive for Defendant OCHN, that increased cost does not excuse performance under the Settlement. When it became a PIHP in Michigan, Defendant OCHN agreed to bear the risk that a recipient's services may cost more than expected. Under 42 U.S.C. § 1395mm(a)(1)(A), health maintenance organizations receive a per capita payment for the individuals they provide services to. These payments are made in advance. 42 U.S.C. § 1395mm(a)(1)(D). "The entity assumes full financial risk on a prospective basis for the provision of health care services listed in subparagraph (A)…." 42 U.S.C. § 1395mm(b)(2)(D). Defendant OCHN assumed the risk that paying for CK's services would be more expensive than that capitated payment. It cannot now use that increased cost to avoid its obligations under the Settlement.

This is especially true because while Defendants have offered increased rates for CK's CLS and In-Home Respite services, it is impossible to tell what rates are necessary to recruit and retain staff for CK because OCHN has flat-out refused to advertise the enhanced rates to their providers. (Exhibits 5-7). OCHN

8

relies on MORC to send referrals to potential providers, and those referrals make *absolutely no reference* to any sort of enhanced rate. (Exhibits 5-7). Instead, MORC sends its provider list a referral like the ones in Exhibits 5-7 and hopes someone agrees to staff the case. There is no incentive for any agency to take the case or recruit new employees because they do not know about the enhanced rate. Likewise, there is little incentive for any jobseeker to work for one of the provider agencies, because no jobseeker knows of the opportunity to work with CK for the pay being offered. This self-imposed barrier is a stunning failure of OCHN's referral system that results in a windfall to OCHN: they still receive the capitated payment for CK's enrollment, but only pay for a fraction of the services deemed medically necessary.

As of late, this case has largely focused on what more can be done to get services in place for CK. Defendant OCHN has repeatedly argued that it is doing all that it can to satisfy the Settlement and find service providers for CK. The Court has often asked Plaintiff's counsel what further measures OCHN could take, via Court Order or otherwise, to comply with the Settlement. Quite frankly, there are numerous, common-sense measures available to OCHN to comply with the Settlement. OCHN has insisted on continuing to rely on MORC to recruit in its usual manner, which is what led to noncompliance with the Settlement in the first place.

9

Because the Settlement is unambiguous, it must be enforced as written unless it is contrary to law or public policy or, if a traditional contract defense applies. *Rory v. Cont'l Ins. Co.*, 473 Mich. 457, 468-69; 703 N.W.2d 23, 30 (2005). Defendant OCHN has not offered evidence that a contract defense applies, so the terms of the Settlement must be enforced as written. Below are measures well within OCHN's capabilities that are not contrary to law and public policy. Plaintiff believes these will lead to provision of CK's services and compliance with the Settlement agreement.

### *Advertising & Recruitment*

Defendant OCHN has acknowledged the shortage of direct-care workers. This shortage is at the current wage level. Agencies with a shortage of workers will never accept a new referral, or recruit to fill that referral, if they are not aware of an enhanced rate (and possible profit margin) for that service recipient. Likewise, workers have no incentive to work for CK if they do not know that his case pays $22/hour instead of $11.50/hour, plus 90-day bonuses.[1] Settlement compliance would surely be much more likely if Defendant OCHN sent referrals for CK's services that made the enhanced rates known to providers. Contracts with these providers should include pass-through provisions mandating that the bulk of the increased rates go to CK's staff, not extra profit for the agencies.

---

[1] Numbers are purely examples, but not out of the realm of the normal rates and CK's staff rate.

Likewise, Defendant OCHN could advertise directly for CK's case, making clear that the pay rate is a one-time only, special offer. Defendant OCHN could advertise on its own website, LinkedIn, Care.com, Indeed, and numerous other job-posting websites. Upon finding interested applicants, OCHN has a few options. The first would be to pass on applicants to sub-contracted service providers. The second would be to hire the applicant directly. This option would allow OCHN to use the entirety of the enhanced rate to pay that worker's wages, instead of losing some of the money to a contracted agency seeking to profit from CK's case. As MORC provides case management services to CK, not OCHN, there is no barrier to this solution other than OCHN's unwillingness. OCHN could also find a new case management entity for CK and have MORC hire a service provider directly with the rate they are offering.

For Defendant OCHN to contend that they are doing everything possible when they are not even advertising for staff at the rate they are willing to pay is absurd. There are options available; the Settlement obligates OCHN to exercise them to ensure provision of CK's IPOS services.

### Contract Terms for Notice of Termination of Services

These contract terms would be simple to include in OCHN's contracts with CK's service providers. The term would not have to apply to any other service recipient. As a penalty for a service-provider's noncompliance, OCHN could

11

recoup money already paid to the staffing agency for the service. This enforcement mechanism, along with other potential options, are already present in the contract in Exhibit 2, p. 19. As previously noted, OCHN is responsible for contracting with CLS and Respite providers; this is within their control alone.

### *Contracting with MORC to Provide CK's Services*

As argued above, 42 C.F.R. § 441.301(c)(1)(vi) only prevents MORC from staffing CK's case if it also provides case management services. If Plaintiff approved of a transfer of case management to OCHN or an independent case management agency, OCHN could contract with MORC to provide the services in CK's IPOS, or contract with MORC to provide a floating staff trained on CK's IPOS to fill any service gaps. OCHN could also seek a waiver as outlined in 42 C.F.R. § 441.301(c)(1)(vi), an option they never pursued. This waiver would allow MORC to provide HCBS and case management for CK. These are common-sense options to comply with the Settlement readily available to Defendant OCHN.

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court grant its Motion for Summary Judgment, find that Defendants are in violation of the Settlement, and enter an order granting the following relief:

A.     Enter an Order requiring Defendants to pay an agency rate of $34.56 an hour for CK's CLS and In-Home Respite services, a Sunday rate of

$51.84 per hour, and $300.00 bonuses to staff for every 90 days that they continue providing services for CK;

B.      Order that the minimum take-home pay for CK's workers be $24/hour Monday-Saturday, and $34/hour on Sundays;

C.      Order that the rates above be increased commensurate with any State or federally mandated rate increases. For example, if the State mandates a $2.25 wage increase for direct-care workers, CK's workers will take home $26.25 Monday-Saturday;

D.      Order Defendants to include the rates described above in any and all referrals to CLS and/or In-Home Respite agency providers;

E.      Order Defendants to include provisions in its contracts with agencies providing services to CK requiring agency providers to give ten (10) days' notice prior to discontinuing service provision for CK;

F.      Order Defendants to include enforcement provisions should agency providers violate the provisions described in (E);

G.      Order Defendants to advertise for providers specifically for CK on its own website, LinkedIn.com and Indeed.com, with language that includes the pay rates in (A) and (B) but makes clear that the rates are a one-time, consumer-specific special offer;

13

H.  Order Defendants to ask Plaintiff's permission and, if given, contract with an agency besides MORC, Inc. for CK's case management services;

I.  Order that upon completion of (H), Defendant contracts with MORC, Inc. for MORC Inc. to provide CK's CLS and In-Home Respite services in the event that other agency providers are unavailable;

J.  Retain jurisdiction over this action to enforce the Settlement;

K.  Award Plaintiff attorney's fees and costs associated with enforcing the Settlement; and

L.  Grant such other relief as it may appear Plaintiff is entitled to or this court deems necessary.

Respectfully submitted,

Dated: October 22, 2021

/s/ Simon F. Zagata
Simon F. Zagata (P83162)
Disability Rights Michigan
Attorney for Plaintiffs
4095 Legacy Parkway
Lansing, MI 48911
(517) 487-1755

14

## CERTIFICATION

I certify that this document complies with Local Rule 5.1(a), including: double-spaced (except for quoted materials and footnotes); at least one-inch margins on the top, sides, and bottom; consecutive page numbering; and type size of all text and footnotes that is no smaller than 10-1/2 characters per inch (for non-proportional fonts) or 14 point (for proportional fonts). I also certify that it is the appropriate length. Local Rule 7.1(d)(3).

Dated: October 22, 2021

/s/ Simon F. Zagata
Simon F. Zagata (P83162)
Disability Rights Michigan
Attorney for Plaintiffs
4095 Legacy Parkway
Lansing, MI 48911
(517) 487-1755

## CERTIFICATE OF SERVICE (E-FILE)

I hereby certify that on October 22, 2021, I electronically filed the above document(s) with the Clerk of the Court using the ECF System, which will provide electronic copies to counsel of record.

Dated: October 22, 2021

/s/ Simon F. Zagata
Simon F. Zagata (P83162)
Disability Rights Michigan
Attorney for Plaintiffs
4095 Legacy Parkway
Lansing, MI 48911
(517) 487-1755