UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

C.K. by his Next Friend,
MARISSA SPRINGSTEAD,

                    Plaintiff,                        Case Number 20-13301

v.                                                 Honorable David M. Lawson

OAKLAND COMMUNITY HEALTH
NETWORK and DANA LASENBY,

                    Defendants.

_____/

## OPINION AND ORDER DENYING PLAINTIFF'S
## MOTION FOR SUMMARY JUDGMENT

The plaintiff filed this case to enforce a settlement agreement between the Oakland Community Health Network (OCHN) and the mother of C.K., a developmentally disabled adolescent to whom OCHN provides community living support services through Medicaid. The settlement agreement aimed to ensure that C.K. received his medically-necessary community living supports and in-home respite services. In this action, C.K. alleges that OCHN and its executive director, Dana Lasenby, have not lived up to their obligations under the settlement agreement. The plaintiff now moves for summary judgment, arguing that the defendants must take specific steps to remedy their alleged breach of the settlement agreement, arguing that their failure to take those steps itself constitutes a breach. However, multiple questions of material fact remain as to what the settlement agreement guarantees, whether the defendants are still in breach, whether injury resulted, and whether any breach is excused by the home care staffing shortage caused by the COVID-19 pandemic. The motion for summary judgment will be denied.

I.

A.  C.K.'s Medicaid Services

The background facts of the case were set forth in detail in the Court's opinion on the motion for a preliminary injunction and motion to dismiss. *C.K. by Next Friend Springstead v. Oakland Cmty. Health Network*, 2021 WL 3810713 (E.D. Mich. Aug. 25, 2021). Plaintiff C.K. is a 15-year-old Medicaid beneficiary diagnosed with autism spectrum disorder, learning disabilities, and obsessive-compulsive and mood-regulation disorders. He has a history of severe outbursts, uncontrolled behavior, and physical aggression, which has resulted in him being hospitalized at least five times for psychiatric treatment. He lives with his mother, Marissa Springstead, in his grandmother's house in Oakland County and receives community living support services through the Oakland Community Health Network (OCHN) and the Macomb Oakland Regional Network (MORC). According to Springstead, C.K. is capable of living in the community with appropriate services; without them, he is at high risk of institutionalization.

OCHN is a specialty prepaid health plan, which is a Medicaid-managed care organization responsible for "providing defined inpatient services, outpatient hospital services, physician services, other specific Medicaid state plan services, and additional services approved by the Centers for Medicare and Medicaid Services under section 1915(b)(3) of Title XIX" of the Social Security Act, 42 U.S.C. § 1396n. Mich. Comp. Laws § 400.109f. Michigan law requires that OCHN provide mental health services to people with developmental disabilities or serious mental illness living in Oakland County, Michigan. *See* Mich. Comp. Laws § 330.1208. OCHN meets its obligations under those statutes by subcontracting with agency providers that employ individual providers to deliver patient services. In the past, OCHN has contracted with MORC to arrange and pay for C.K.'s services; MORC then subcontracted with service agencies to furnish the

- 2 -

services in C.K.'s individual plan of service.  MORC now provides case management services for C.K.  The services OCHN is authorized to provide C.K. are detailed in C.K.'s individual plan of service (IPOS), which allocates a certain number of service "units" — the equivalent of 15-minutes of services — over a certain number of months.  C.K.'s mother states that C.K.'s IPOS authorizes him to receive 30 community living supports hours and 12 in-home respite hours per week.

C.K.'s mother swore in an affidavit that at-home services "are essential" for C.K.'s health.  She explained that C.K. "struggles to communicate, regulate his emotions and express himself appropriately."  Springstead Aff. ¶ 37, ECF No. 13-2, PageID.93.  C.K. "often fixates on things and people," and if he does not get what he wants, he often exhibits aggressive or violent behavior.  *Id.* at ¶ 39.  The community living support services "are designed to help him cope with his emotions, teach him how to communicate appropriately, and express himself without aggression."  *Id.*, ¶ 38 at PageID.94.  The service providers "use techniques to redirect him from what he is fixating on . . . with small games or sensory activities.  *Id.* at ¶ 40.  And when C.K. fixates on his mother, his service providers "act as an intermediary, redirecting the fixation before C.K." acts aggressively.  *Id.* at ¶ 42.

## B.  Settlement

In June 2017, C.K. sued OCHN and its then-director, the Michigan Department of Health and Human Services (MDHHS) and its then-director, and then-Michigan Governor Rick Snyder for declaratory and injunctive relief requiring that the defendants provide certain support services for his behavioral needs.  *C.K. v. Michigan Dep't of Heath of Human Servs.*, No. 17-11988.  He demanded that he be provided adequate intensive crisis stabilization, applied behavior analysis, community living support services, and respite services under Michigan's Medicaid program.  He alleged that discharging him from a hospital without those support services violated his rights

under the Americans with Disabilities Act, 42 U.S.C. § 12132 *et seq.*, the Rehabilitation Act of

1973, 29 U.S.C. § 794, and the Social Security Act, 42 U.S.C. §1396a.

The parties settled that case, with the defendants agreeing to pay C.K. $32,500 (split

between OCHN and MDHHS defendants equally) in exchange for a full release of all claims

against them.  Additionally, the agreement called for the provision of additional services, and

provisions were made for staffing guarantees.  The key language of the agreement reads as follows:

> 4.  Community Living Support (CLS) Services and In-Home Respite will
> be provided to CK as indicated in the IPOS and scheduled in compliance with
> the Medicaid Provider Manual.  Ms. Springstead will no longer be the Employer
> of Record (EOR) for CLS or In-Home Respite Services.  OCHN will require
> that the contract with any CLS and/or In-Home Respite provider has stipulations
> preventing the provider from discontinuing service without notice and/or prior
> to another provider or staffing option being identified.  OCHN will enforce
> contract provisions with MORC to supply its own staff on those occasions where
> a sub-contracted provider cannot staff CLS and/or In-Home Respite Services.
> MORC will ensure coordination of care between CLS and ABA by facilitating
> informal training (shadowing) education, and ongoing communication.  At no
> time will OCHN condone or fund duplicative services.

Settlement Agreement, ECF No. 1-2, PageID.23.   The Court approved the settlement and

dismissed the case on April 24, 2018.

### C.  Post-Settlement Performance

The plaintiff lived at home with proper services from June 2018 until March 2020, when

the coronavirus pandemic began to upset most aspects of daily living.  The plaintiff alleges that

C.K. did not receive in-person community living supports or respite services between the weeks

of March 13, 2020 and August 10, 2020, and between October 23, 2020 and January 3, 2021.

Services resumed in part between August 10, 2020 and October 23, 2020, but without sufficient

staff to fill all of C.K.'s service hours.  Although the parties disagree as to why the initial service

stoppage occurred, it is clear that the defendants experienced pandemic-related staffing shortages

that caused service interruptions at least through August 2021.

Beginning around April 2020, OCHN contacted about 15 different support providers to secure community supports services for C.K., to no avail.  They finally found a provider, First Day Home Care, and C.K.'s mother signed a services contract with that provider on July 30, 2020. First Day began providing community living supports services on August 11, 2020, which continued smoothly until around September 24, 2020, when First Day reported that it was short-staffed and could not provide C.K. all his service hours.  Then, on October 6, 2020, two First Day staff members requested to be removed from C.K.'s care; First Day officially stopped providing services for C.K. later that month.  OCHN unsuccessfully tried to secure staffing throughout October, November, and December, until New Horizons agreed to provide community support services for C.K. beginning January 4, 2021.  However, C.K. threw a VHS tape at a worker's neck and punched her shortly thereafter, causing New Horizons to stop serving C.K. on January 19, 2021.

C.K.'s mother expressed growing concern for her son and the safety of her family over the lack of help.  C.K. turned 15 years old and weighed about 195 pounds.  He had assaulted service providers, and in October 2020 he punched his mother in the ribcage, knocking the wind out of her and leaving a bruise that lasted two weeks.  He also assaulted his grandmother.  In December, he had an episode over moving his bed; he threw a lamp at his mother and tried to break down the door to his room.  C.K.'s mother observed that "CK's behavior has worsened substantially since [community living supports] and Respite services stopped.  He is more aggressive more frequently [and] does not have appropriate staff to teach him the skills he needs to be as independent as possible."  Springstead Aff. ¶ 62, ECF No. 13-2, PageID.96-97.   She expressed worry that C.K. will pose too much of a danger to his grandmother, who provided their only home.

D.  Complaint and Preliminary Injunction

On December 15, 2020, C.K.'s mother filed the present action on C.K.'s behalf.  The complaint asks for (1) a declaration that the defendants violated the settlement agreement; (2) an order requiring the defendants' specific performance of the settlement agreement's terms; (3) the imposition of a monetary penalty for each day the defendants fail to comply with the Court's order; (4) the appointment of an independent monitor to ensure the defendants' compliance with the agreement; and (5) an award of attorney's fees.  After New Horizon halted service, C.K. also moved for a preliminary injunction to compel the defendants to comply with the 2018 settlement agreement.

The Court granted the motion for a preliminary injunction in part on August 25, 2021.  *C.K. by Next Friend*, 2021 WL 3810713, at *1.  It found it "quite evident" that the OCHN defendants breached the settlement agreement by failing to provide community living supports, respite services, and crisis stabilization services.  *Id.* at *8.  Although the Court acknowledged that "C.K.'s residence was far away from service providers; COVID-19 reduced staff availability; C.K.'s disabilities were unique; there were several service providers refusing to accept new referrals; and there was a dearth of available caregivers," it reasoned that those factors should have been taken into account when the settlement was drafted.  *Id.* at *9.  And it found "no evidence that when C.K.'s service providers dropped out, OCHN ever tried to compel MORC to provide C.K.'s services itself."  *Id.* at *8.  The Court restrained OCHN from refusing to comply with the terms of the settlement agreement reached in case 17-11988; from failing to enforce contract provisions with Macomb-Oakland Regional Center (MORC) that require MORC to use their own staff to provide C.K.'s CLS and Respite services; and from failing to provide Intensive Crisis Stabilization

Services to C.K. within the time parameters set forth in the settlement agreement. *Id.* at *12. The Court also dismissed the state defendants from the case. *Id.* at *7.

### E. Post-Injunction Performance

The parties agree that OCHN has not provided C.K. all of his service hours since the Court entered the preliminary injunction, but they disagree as to the extent of the gap.   A joint status report the parties filed on September 24, 2021 indicates that C.K. was only receiving in-person services three days a week, for a total of 15 hours.  Status Rep., ECF No. 50, PageID.545.  The plaintiff cited the status report in his motion for summary judgment and provided no evidence or argument that his services have changed since, for better or worse.  In contrast, the OCHN defendants allege that C.K.'s community living supports services have been provided consistently since August 25, 2021, with the exception of the usual, minor interruptions.  OCHN Chief Legal Officer Callana Ollie swore in an affidavit that all such interruptions are "due to scheduled support staff reporting positive COVID-19 tests, support staff childcare issues, and occasionally other family illnesses," and that when they occur, replacement staff have been secured within 24 hours. Ollie Aff., ¶¶ 6-8, ECF No. 61, PageID.861-62.

To fill service gaps, OCHN offers a substantially increased rate and retention bonuses to providers of C.K.'s community living support and in-home respite services.  Compared to its standard community living supports rate of $19.64 per hour, OCHN pays $31.52 to $34.56 to C.K.'s service providers.  Compared to the standard respite rate of $11.40, OCHN pays $31.52 for C.K.  OCHN also pays a $300 staffing bonus every 90 days to all staff working C.K.'s case.  The parties dispute whether and how OCHN advertises this higher rate.  OCHN says that it notifies providers of the higher rates during recruitment and includes C.K.'s rates in all its direct service contracts.  The plaintiff points to OCHN's referral forms, which do not include rate information.

The record includes three contracts between OCHN and service providers entered after the settlement agreement.  All three include clauses that obligate providers to give 120 days notice before termination and to continue providing medically-necessary services for a period following the termination of the contract.  *See* MORC Cont., ECF No. 56-2, PageID.624-625; Genesis Cont., ECF No. 56-3, PageID.691-92; Pro Care Cont., ECF No. 56-4, PageID.744-46.  They also include clauses permitting OCHN to recoup monies previously paid for services not provided.  MORC Cont., ECF No. 56-2, PageID.611; Genesis Cont., ECF No. 56-3, PageID.682; Pro Care Cont., ECF No. 56-4, PageID.736.  OCHN's contract with MORC further obligated MORC to "give OCHN notice of all additions and discontinuations of direct service providers with seven (7) days." MORC Cont., ECF No. 56-2, PageID.644.

In a supplemental filing, the defendants informed the Court that OCHN instituted a new policy on November 12, 2021, outlining the organization's "expectation of all network providers for notification of any changes to the composition of a provider organization that negatively impact access to care."  Policy CC 3.1, ECF No. 66-5, PageID.948.  The policy requires that all network providers notify "OCHN immediately but no later than 24 hours" of any changes that "may result in OCHN having reduced network capacity to the extent that people served cannot access services in a timely manner."  *Ibid.*  The policy further requires network providers to include in their notice a "plan for resolution," and authorized OCHN to implement emergency procurement when changes to the composition of a provider network organization occur.  *Id.* at PageID.948-49.

OCHN's provider contracts incorporate OCHN's policies, procedures, and protocols.  *See, e.g.*, MORC Cont., ECF No. 56-2, PageID.592-93; Genesis Cont., ECF No. 56-3, PageID.665-66; Pro Care Cont., ECF No. 56-4, PageID.715-16.

II.

The plaintiff filed the present motion for summary judgment in October of last year.  The Court heard arguments last January.  In the meantime, the parties had attempted to reach another settlement which, despite their mutual good-faith efforts, they were unable to achieve.

The plaintiff contends that gaps persist in fulfilling C.K.'s plan of service and that OCHN has not done everything in its power to comply with the settlement agreement.  He says that OCHN unambiguously violated the settlement in three ways: (1) by failing to provide C.K. with all his community living support or respite service hours over long stretches of time; (2) by failing to contractually mandate that C.K.'s providers give notice or identify another servicer before discontinuing services; and (3) by failing to contract with MORC so that it can staff C.K.'s service hours if a provider agency is unable to cover them.  He does not make any arguments with respect to crisis stabilization services.  The plaintiff wants the Court to enter an order requiring the defendants to (1) pay $34.56 per hour for C.K.'s services with a $300 retainment bonus; (2) include these rates in any agency referrals; (3) contractually mandate service providers to give 10 days' notice before discontinuing services for C.K.; (4) publicly advertise for providers specifically for C.K.; and (5) ask the plaintiff's permission to contract with an agency besides MORC for C.K.'s case management, then contract with MORC for at-home services.

The defendants counter that the agreement makes no promise of uninterrupted services and C.K. has received all the services authorized under his individual plan of service; but even then, they say, they have done their utmost to ensure that C.K.'s service hours are covered, contacting more than 70 service providers since entering the settlement agreement, paying increased rates, and making the rates known to providers.  They also argue that their agency provider contracts already include termination clauses, which provide sufficient notice before services are

discontinued and obligate providers to develop transition plans to ensure continuity of service. Finally, the defendants insist that the settlement agreement provision requiring MORC to directly staff C.K.'s services is unenforceable, because Medicaid rules bar OCHN from contracting with MORC to provide C.K.'s at-home services, *see* 42 C.F.R § 441.301(c)(1)(vi), and that MORC also does not provide direct support services in any case.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A trial is required when "there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

The party bringing the motion first must explain why the record is so settled that no genuine issues of material fact exist by "identify[ing] those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627-28 (6th Cir. 2018) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). To rebut that showing, "[t]he nonmoving party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Id.* at 628 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). The opposing party must base that rebuttal on specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. Notably, however, "[t]he court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether

it is so one-sided that one party must prevail as a matter of law.'"  *Alexander v. CareSource*, 576

F.3d 551, 557-58 (6th Cir. 2009) (quoting *Anderson*, 477 U.S. at 251-52).

In considering the plaintiff's motion for summary judgment, the Court may rely on "the

findings of fact and conclusions of law from its ruling on [the plaintiff's] motion for a preliminary

injunction."  *Cintas Corp. v. Perry*, 517 F.3d 459, 466 n.2 (7th Cir. 2008).  Consideration of the

preliminary injunction record is appropriate where, as here, the parties have presented "very little

new evidence" between the preliminary injunction hearing and the close of discovery.  *Ibid.*; *see*

*also U.S. S.E.C. v. Bravata*, 3 F. Supp. 3d 638, 644 (E.D. Mich. 2014), *aff'd sub nom. United*

*States v. Bravata*, 636 F. App'x 277 (6th Cir. 2016) (Lawson, J.) ("[E]vidence that is received on

[a] motion [for preliminary injunction] and that would be admissible at trial becomes part of the

trial record and need not be repeated at trial.") (quoting Fed. R. Civ. P. 65(a)(2)); *Bright v. Nunn*,

448 F.2d 245, 247 n.1 (6th Cir. 1971) (finding the trial court properly granted motion to dismiss

based on the preliminary-injunction motion record where facts were uncontested in the decisive

respects of the case); *Clinkscales v. Chevron U.S.A., Inc.*, 831 F.2d 1565 (11th Cir. 1987) (finding

that affidavits appended to an earlier motion for preliminary injunction "were properly before the

district court in ruling on the summary judgment motions").

Because a settlement agreement is nothing more than a contract, the gravamen of the

plaintiff's claims is breach of contract.  *Cogent Sols. Grp., LLC v. Hyalogic, LLC*, 712 F.3d 305,

309 (6th Cir. 2013) (citations omitted).  The claims, therefore, are "governed 'by reference to state

substantive law governing contracts generally.'"  *Ibid.*  Here, Michigan law governs.

To prevail on his motion, the plaintiff must demonstrate the absence of material fact issues

on each element of his breach-of-contract claims: (1) the terms of the contract, (2) breach of those

terms by the defendants, and (3) injury to the plaintiff resulting from the breach.  *Lossia v. Flagstar*

*Bancorp Inc.*, 895 F.3d 423, 528 (6th Cir. 2018) (citing *Miller-Davis Co. v. Ahrens Const., Inc.*, 296 Mich. App. 56, 71, 817 N.W.2d 609, 619 (2012)).  The plaintiff argues that the defendants breached the settlement agreement in three specific ways.  Genuine issues of material fact remain as to each.

### 1.  Provision of IPOS Services

The agreement states that "Community Living Support (CLS) Services and In-Home Respite will be provided to CK as indicated in the IPOS [individual plan of service]."  Settlement Agreement, ECF No. 1-2, PageID.23.  As evidence of the defendants' breach of this provision, the plaintiff alleges that he received only 15 hours of services per week as of September 2021, and he references the long stretches he endured without receiving any community living supports or respite services throughout 2020 and 2021.  Several fact questions preclude summary judgment on that basis, however.

For one, it is not clear from the record how many service hours C.K. presently is receiving.  The defendants maintain that C.K. has received consistent services since the Court entered the preliminary injunction, and that any disruptions have been minor and are usually caused by workers calling in sick after contracting COVID-19.  They also maintain that replacement service providers have been secured to cover any such shortages.  MSJ Resp., ECF No. 60, PageID.805; Ollie Aff., ¶¶ 6-8, ECF No. 61, PageID.861-62.  The plaintiff has not supplied any evidence to the contrary, resting instead on C.K.'s agency provider schedule as of September 2021.

In addition, the settlement agreement itself is ambiguous.  Courts applying Michigan contract law interpret settlement agreements with the main purpose of "honor[ing] the intent of the parties."  *Evoqua Water Techs., LLC v. M.W. Watermark, LLC*, 940 F.3d 222, 229 (6th Cir. 2019) (quoting *Rasheed v. Chrysler Corp.*, 445 Mich. 109, 127, n.28, 517 N.W.2d 19, 29 n.28 (1994)).

To discern that intent, a court "must look for the intent of the parties in the words used in the instrument." *Mich. Chandelier Co. v. Morse*, 297 Mich. 41, 49, 297 N.W. 64, 67 (1941).  But where the settlement agreement's "meaning is obscure and its construction depends upon other and extrinsic facts in connection with what is written, the question of interpretation should be submitted to the jury, under proper instructions." *O'Connor v. March Automatic Irrigation Co*, 242 Mich. 204, 210, 218 N.W. 784, 787 (1928) (citation omitted).  Here, the defendants argue that the settlement agreement does not guarantee uninterrupted services and, accordingly, temporary staffing interruptions do not constitute breach.  The settlement agreement references C.K.'s IPOS, an updated version of which is not in the record.  *See* IPOS, ECF No. 13-3, PageID.108 (allocating service units through May 31, 2021).  Thus, it is not clear how many service units — i.e., 15 minutes of services — C.K.'s current IPOS authorizes.  Nor, again, is it clear how many service units C.K. presently is receiving.  Nevertheless, the structure of the IPOS suggests that OCHN could still "provide[] to CK" services "as indicated in the IPOS" despite temporary service disruptions.  *See* Settlement Agreement, ECF No. 1-2, PageID.23.  The IPOS "authorize[s]" service units, which then may be "claimed" or remain "available" for further use, indicating that some units may go unclaimed.  IPOS, ECF No. 13-3, PageID.104-08.  Whether the settlement agreement permits that practice — or service units in fact are going unused — is another question of fact inappropriate for summary judgment.  *See Klapp v. United Ins. Grp. Agency, Inc*., 468 Mich. 459, 469, 663 N.W.2d 447, 453-54 (2003) ("It is well settled that the meaning of an ambiguous contract is a question of fact that must be decided by the jury." (citing *Hewett Grocery Co. v. Biddle Purchasing Co*., 289 Mich. 225, 236, 286 N.W. 221, 226 (1939)).  The IPOS does not explicitly address service interruptions.

- 13 -

The defendants also raise the defense of impossibility of performance. Michigan law recognizes that defense, but the defendants must demonstrate "'impracticability because of extreme and unreasonable difficulty, expense, injury or loss involved.'" *Roberts v. Farmers Ins. Exchange*, 275 Mich. App. 58, 74, 737 N.W.2d 332, 342 (2007) (quoting *Bissell v. L.W. Edison Co.*, 9 Mich. App. 276, 284, 156 N.W.2d 623, 626 (1967)). Here, they argue that the COVID-19 pandemic is a supervening impossibility unforeseeable to the parties at the time of contracting, which caused all of the service interruptions C.K. experienced in 2021. Ollie Aff., ¶¶ 3-4, ECF No. 62, PageID.861. The defendants do not argue that the mere difficulty or expense of contracting with service providers makes performance impracticable. *See Chase v. Clinton Cnty.*, 241 Mich. 478, 484, 217 N.W. 565, 567 (1928). Rather, they contend that the home care staff shortage is a nationwide phenomenon that even higher pay rates cannot fix. That is due both to the fact that providers are front-line workers who contract the coronavirus at high rates, resulting in increased and unavoidable sick leave, and to home and health care workers leaving the industry for lower-risk employment. And the defendants assert that they have invested significant effort and expense toward securing services for C.K., contacting more than 70 agency providers and offering to pay rates as much as three times higher than average. Performance was impossible, they say because home care workers simply are not available. That creates a genuine question of material fact. *See Roberts*, 275 Mich. App. at 74, 737 N.W.2d at 343 ("Where there is conflicting evidence on the question of impossibility, it is a question of fact for the trier of fact to resolve.") (citing Barnes v. B & V Const., Inc., 137 Mich. App. 595, 598–99, 357 N.W.2d 894, 896 (1984)); *Lampo Grp., LLC v. Marriott Hotel Servs., Inc.*, No. 20-00641, 2021 WL 5178839, at *12 (M.D. Tenn. Nov. 8, 2021) (finding that more facts were needed to determine whether COVID-19 made performance of a contract impracticable).

Finally, the defendants contend that the plaintiff is not eligible for some of the equitable relief he seeks.  In his motion, the plaintiff asks the Court for an order requiring the OCHN defendants to pay a certain rate for his services and advertise that rate in specific ways, among other things.  But the settlement agreement does not address service provider rates or advertising methods, and the Court "may not rewrite the parties' contract to add terms that the parties did not include."  *Sylvester v. FCCI Ins. Co.*, 373 F. Supp. 3d 857, 861 (E.D. Mich. 2019) (Lawson, J.) (citing *Reicher v. SET Enterprises, Inc.*, 283 Mich. App. 657, 665, 770 N.W.2d 902, 907 (2009)). Moreover, it appears that the defendants already are advertising the rates the plaintiff requests. Ollie Aff., ¶¶ 11-12, ECF No. 61, PageID.862; Interrog., ¶ 7, ECF No. 60-2, PageID.838. Although they are not advertising for workers on public-facing job-search sites like Indeed, that is because the OCHN is not a direct service provider.  That OCHN has no ability to individually employ direct care workers to work specifically with C.K. is further evidence that the settlement agreement does not compel it to engage in the kinds of advertising the plaintiff demands.  It is similarly unclear whether OCHN can compel agency providers to advertise C.K.'s rates on their websites, as the plaintiff suggests.

The plaintiff is not entitled to summary judgment on this aspect of his breach of contract claim.

## 2. Contract Terms for Notice of Termination of Services

The plaintiff argues that the defendants breached their promise to "require that the contract with any CLS and/or In-Home Respite provider has stipulations preventing the provider from discontinuing service without notice and/or prior to another provider or staffing option being identified."  Settlement Agreement, ECF No. 1-2, PageID.23.  The plaintiff asks that OCHN be required to update its provider contracts to include "Terms for Notice of Termination of Services."

The record demonstrates, however, that OCHN's post-settlement agency provider contracts include such termination provisions. The provisions require agency providers to give 120 days' notice before terminating their service contract, and to "continue to provide medically necessary Services to each Eligible Individual it served immediately prior to the expiration of termination until responsibility for the Eligible Individual's Services is transferred to another provider with OCHN's prior approval." MORC Cont., ECF No. 56-2, PageID.611; Genesis Cont., ECF No. 56-3, PageID.682; Pro Care Cont., ECF No. 56-4, PageID.736.

At least one of the contracts also obligated the service provider to "give OCHN notice of all additions and discontinuations of direct service providers with seven (7) days." MORC Cont., ECF No. 56-2, PageID.644. Although the other two contracts in the record do not include a similar provision, the plaintiff has not demonstrated that OCHN's other contracts lack discontinuation clauses.

In their supplemental filing, the defendants contend that OCHN Policy CC 3.1 demonstrates a material fact issue on this aspect of the plaintiff's claim. As noted earlier, the settlement agreement requires OCHN to include in service provider contracts stipulations preventing the service provider from "discontinuing service without notice," "and/or" discontinuing service "prior to another provider or staffing option being identified." Settlement Agreement, ECF No. 1-2, PageID.23. It appears that OCHN includes at least one of the two stipulations in all provider contracts. Every provider contract in the record incorporates OCHN's policies, which include Policy CC 3.1. *See, e.g.*, MORC Cont., ECF No. 56-2, PageID.592-93; Genesis Cont., ECF No. 56-3, PageID.665-66; Pro Care Cont., ECF No. 56-4, PageID.715-16. Policy CC 3.1 in turn requires service providers immediately to notify OCHN of staff changes impacting services. Policy CC 3.1, ECF No. 66-5, PageID.948. Therefore, it appears that all

OCHN provider contracts incorporate strict notification requirements, which directly counters the plaintiff's contention that OCHN contracts lack discontinuation clauses.

Whether the settlement agreement, which includes the partially disjunctive "and/or," also obligates the defendants to include in its contract terms preventing discontinuation of services prior to another provider being identified is unclear. *See generally* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 125 (2012) (collecting "experts" that "warn against" use of the "hybrid" and/or); Kenneth A. Adams, *Know Your Enemy: Sources of Uncertain Meaning in Contracts*, Mich. B.J. 40, 42 (Oct. 2016) (discussing the "ambiguity of the part versus the whole" presented by the words "and" and "or"). Again, the meaning of ambiguous contract language is a question for the finder of fact. *Klapp*, 468 Mich. at 469, 663 N.W.2d at 453-54.

The plaintiff contends that the defendants are not doing enough to enforce existing contract provisions aimed at ensuring continuity of services. The defendants argued otherwise in their response to the plaintiff's motion, and Policy CC 3.1 buttresses their defense. Policy CC 3.1 includes enforcement mechanisms to ensure continuity of services, including requiring providers to inform OCHN of their "plan for resolution" of reduced capacity, and a provision authorizing OCHN to procure services on an emergency basis if changes in network provider staffing negatively would affect access to care. Policy CC 3.1, ECF No. 66-5, PageID.949. Defense counsel represented at oral argument on the summary judgment motion that OCHN has used the emergency procurement enforcement mechanism to procure services for C.K. That suggests that the defendants are endeavoring to identify another provider before services are discontinued. Whether the settlement agreement obligates the defendants to do more than this — e.g., whether it guarantees uninterrupted services, or instead provides a mechanism for responding to service interruptions — is another fact question inappropriate for summary judgment.

### 3. MORC Contract

Finally, the plaintiff argues that OCHN breached its promise to "enforce contract provisions with MORC to supply its own staff on those occasions where a sub-contracted provider cannot staff CLS and/or In-Home Respite Services."   Settlement Agreement, ECF No. 1-2, PageID.23.

The defendants contend that this provision is unenforceable, for two reasons.  First, the defendants argue that the Medicaid Home and Community-Based Services (HCBS) Rule, 42 C.F.R § 441.301(c)(1)(vi) (2014), prohibits MORC from acting both as C.K.'s case manager and at-home service provider.  That Rule sets forth the requirements under which states may use federal Medicaid funds to provide home and community-based long-term services and supports.   One such requirement aims to prevent conflicts of interest by requiring states to apply for Medicaid service waivers before permitting entities that provide case management services to also provide at-home services.   The relevant regulation reads:

> Providers of HCBS for the individual, or those who have an interest in or are employed by a provider of HCBS for the individual must not provide case management or develop the person-centered service plan, except when the State demonstrates that the only willing and qualified entity to provide case management and/or develop person-centered service plans in a geographic area also provides HCBS. In these cases, the State must devise conflict of interest protections including separation of entity and provider functions within provider entities, which must be approved by CMS. Individuals must be provided with a clear and accessible alternative dispute resolution process.

*Ibid.*

That regulation, however, pre-dates the settlement agreement and should have been anticipated by the parties. *See Vergote v. K Mart Corp.*, 158 Mich. App. 96, 110-11, 404 N.W.2d 711, 717-18 (1987) (finding "the defense of impossibility . . . not available" where an event was "reasonably foreseeable" when the parties entered into the contract).  Moreover, the regulation

does not make it impossible for MORC to coordinate agency services for C.K.  As the plaintiff points out, the HCBS Rule only prevents MORC from staffing C.K.'s case if MORC also provides case management services.  For that reason, the plaintiff proposes that his case management be transferred to OCHN or a different independent case management agency, so that OCHN may contract with MORC to provide C.K.'s community living and respite services.  More importantly, the HCBS Rule clearly contemplates that certain case management entities will also provide at-home services, because it includes a waiver provision enabling them to do so upon approval from the Centers for Medicare & Medicaid Services. 42 C.F.R § 441.301(c)(1)(vi).  The regulation therefore does not constitute "the destruction of the means of performance . . . by law," and "does not fall within the scope of the circumstances encompassed by the doctrine of impossibility." *Alliant Tax Credit Fund 31-a, Ltd v. Taylor 8 Assocs. LLC*, No. 08-12938, 2009 WL 691900, at *3 (E.D. Mich., Mar. 12, 2009) (Battani, J.) (citation and quotation marks omitted).  The regulation alone does not excuse the defendants' performance of the settlement agreement.

Second, the defendants argue that MORC never supplies its own staff but rather, like OCHN, contracts for direct support services.  The record provides some support for that contention.  OCHN's contract with MORC was for "core services," MORC Cont., ECF No. 56-2, PageID.592, not direct services, *cf.* Genesis Contr., ECF No. 56-3, PageID.664, and MORC appears to have provided services for C.K. in the past by contracting with other agency providers, *see* PI Mot. Resp., ¶¶ 27, 35-37, ECF No. 21, PageID.204-05; Interrog., ¶¶ 5-6, ECF No. 60-2, PageID.830-33 (asking for a list of the agency providers MORC has contracted with for C.K. and excluding MORC from a list of "agency providers").  If MORC does not provide direct services, it may be impossible for "its own staff" to provide C.K.'s community living supports and respite services.  It is logical to assume that OCHN knew that MORC's "own staff" could not and would

not provide direct services to C.K. when OCHN entered the settlement agreement.  Nevertheless, the record presently before the Court does not settle this issue of material fact.

Whether it was impossible for OCHN to perform this promise also is relevant to injury. The record demonstrates that OCHN contracts with numerous agency providers to provide community living supports and respite services.  It also demonstrates that OCHN has contacted at least 70 agency providers in an effort to ensure that C.K. receives the services outlined in his individual plan of service.  MORC presumably would make similar and overlapping efforts to contract with the same universe of agency providers to provide services to C.K.  The plaintiff has made no showing that MORC's failure to do so caused service disruptions or other injury — or that OCHN continuing to enforce its contract with MORC would have prevented any of the service disruptions C.K. experienced.  Genuine questions of material fact therefore remain as to the scope of any injuries resulting from the defendants' breach.

III.

The plaintiff is not entitled to summary judgment on his claim that the OCHN defendants breached their settlement agreement. Issues of material fact remain as to whether the defendants breached the settlement agreement, whether injury resulted, and whether the defendants' performance was impracticable.

Accordingly, it is **ORDERED** that the plaintiff's motion for summary judgment (ECF No. 56) is **DENIED**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:  July 21, 2022